# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**Civil Action No. _____**

BRANDON LEIDEL, individually,
and on behalf of All Others Similarly Situated; and
JAMES D. SALLAH, ESQ., as Receiver/Corporate Monitor of
Project Investors, Inc. d/b/a Cryptsy,

       Plaintiffs,

v.

COINBASE, INC., a Delaware corporation
d/b/a Global Digital Asset Exchange (GDAX);

       Defendant.
_____/

## CLASS ACTION COMPLAINT

Plaintiffs, BRANDON LEIDEL ("LEIDEL"), individually and on behalf of all other persons similarly situated ("Class Plaintiffs"), and JAMES D. SALLAH, ESQ., as Receiver/Corporate Monitor (the "Receiver") of Project Investors, Inc. d/b/a Cryptsy (collectively the "Plaintiffs"), by and through undersigned counsel, hereby sue Defendant, COINBASE, INC., a Delaware corporation d/b/a Global Digital Asset Exchange (GDAX), for damages and for equitable relief.  In support thereof, Plaintiffs state as follows:

## PRELIMINARY STATEMENT

1.      This nationwide class action is brought by Plaintiff LEIDEL, individually and on behalf of a class of similarly situated users (the "Class Members") of Project Investors, Inc. d/b/a Cryptsy ("CRYPTSY"), a cryptocurrency exchange and Money Services Business based in South Florida that served clients located both in the United States and abroad.

2.     Additionally, this action is brought by the Receiver, who on April 4, 2016 was appointed by the United States District Court for the Southern District of Florida to serve as the Receiver/Corporate Monitor over the affairs and operations of CRYPTSY and to, *inter alia*, "*administer and manage the business affairs, funds, assets, choses in action and any other property of [CRYPTSY]; marshal and safeguard all of CRYPTSY's assets; and take whatever actions are necessary for the protection of CRYPTSY investors and customers.*"[1]

3.     At all material times, COINBASE operated an online business for general consumers and the public to exchange, invest, and trade in digital cryptocurrencies.  Plaintiffs seek damages based upon the unlawful conduct of COINBASE in failing to properly monitor customer accounts that held investors' money and ignoring its duty to investigate suspicious activities under U.S. anti-money laundering rules.

4.     CRYPTSY and COINBASE should have been shining examples of the fundamental tenet of cryptocurrency: that without governmental regulation, a community of users can create and self-regulate a form of currency that serves as a viable – if not preferred -- alternative to traditional, government-backed currency.

5.     Furthermore, CRYPTSY should have been a validation of COINBASE's proof of concept: that a digital currency exchange is a legitimate business operation and that COINBASE could act as its liquidator.  However, CRYPTSY instead proved that the loosely regulated, if not unregulated, cryptocurrency industry is still a haven for criminal activity and that those inside the industry oftentimes protect their fellow insiders.

---

[1] *See*, **Exhibit "A"** hereto (April 4, 2016 "Order Granting Plaintiffs' Renewed Motion for Appointment of James D. Sallah, Esq. as Receiver/Corporate Monitor over Defendant, Project Investors, Inc. d/b/a Cryptsy"). [*Leidel, et al. v. Project Investors, Inc. d/b/a Cryptsy, Paul Vernon, and Lorie Ann Nettles*, U.S. District Court - Southern District of Florida - Case No. 9:16-cv-80060-MARRA at Docket Entry No. ("DE") 33] (the "Receivership Order").

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

6.      As the facts demonstrate, an unregulated community is ripe for abuses; and even the purportedly upstanding members of that community – no matter how right-minded and honorable they appear to be on the surface – are prone to engage in criminal activity when they think they won't be caught.

7.      Plaintiffs and Class Members, and the Receiver, seek compensatory damages, exemplary and punitive damages where appropriate and allowed, and an injunction enjoining the continuation of Defendant's unlawful conduct.

## GENERAL ALLEGATIONS

### THE PARTIES

### Plaintiffs

8.      Plaintiff LEIDEL is an individual domiciled in Miami, Florida and is *sui juris*.

9.      The Receiver is an attorney approved and appointed by the District Court to serve as the Receiver for CRYPTSY and its subsidiaries, successors, and assigns.  As set forth in the Receivership Order, the Receiver is empowered to, *inter alia*:

> Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any lawsuits or arbitrations in state, federal or foreign jurisdictions necessary to preserve or increase the assets of Cryptsy and/or on behalf of Cryptsy and for the benefit of its investors and customers against: (1) those individuals and/or entities which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated, transferred or received any assets, properties, monies, proceeds or other items of value directly or indirectly traceable from Cryptsy, including Cryptsy and its officers, directors, employees, agents or any persons acting in concert or participation with them; or (2) any transfers of assets, properties, monies, proceeds or other items of value directly or indirectly traceable from Cryptsy investors or customers.   Such actions may include, but not be limited to, seeking imposition of constructive trusts, seeking imposition of equitable liens, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, *et. seq.* or otherwise, rescission and restitution, the collection of debts, and such Orders or other relief supported in law or equity from this Court as may be necessary to enforce this Order.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

**Defendant**

10.     Defendant COINBASE is a Delaware corporation with its principal place of business in San Francisco, California.  COINBASE holds itself out as a digital currency wallet and secure online platform where merchants and consumers can transact with new digital currencies like Bitcoin and Ethereum and where users can buy, sell, transfer, and store their digital currency.

11.     COINBASE also holds itself out as a regulated and fully compliant entity, registered with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") as a Money Services Business, as that term is defined by FinCEN.

12.     Since May 2016, COINBASE has been operating as Global Digital Asset Exchange (GDAX).  GDAX is not registered with FinCEN.

13.     According to published reports, COINBASE operates digital Bitcoin wallets for over 3 million people across the globe, including but not limited to wallet-holders in this District.

### JURISDICTION AND VENUE

**Subject Matter Jurisdiction**

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds Five Million Dollars ($5,000,000.00), exclusive of interest and costs, and is a class action in which some members of the Class are citizens of different states than Defendant. *See*, 28 U.S.C. § 1332(a) and 1332(d)(2)(A).  This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

**Personal Jurisdiction**

15.    This Court has personal jurisdiction over Defendant because: (a) Defendant is operating, present, and/or doing business within this District, (b) Defendant resides within this jurisdiction, and (c) Defendant's breaches and tortious activity occurred within this District.

16.    Defendant is licensed by the Florida Office of Financial Regulation to conduct business as a Money Transmitter (Part II) in this state, and indeed conducts such business in the state of Florida.  Moreover, according to FinCEN's records, Florida is one of the states in which Defendant conducts business as a Money Services Business.

17.    Additionally, Defendant entered into a contract with Florida residents CRYPTSY and Paul Vernon (CRYPTSY's CEO) when CRYPTSY and Mr. Vernon resided in this District. Traditional monies and cryptocurrencies were routinely transferred by and between CRYPTSY/Mr. Vernon and Defendant -- including deposits by Defendant into CRYPTSY's and Mr. Vernon's bank accounts in Florida -- and Defendant was aware that CRYPTSY/Mr. Vernon were located here and did business here.

18.    In light of the foregoing, Defendant has purposefully availed itself of the benefits of operating in this jurisdiction; and this Court may exercise personal jurisdiction over Defendant.

**Venue**

19.    Venue is proper pursuant to 28 U.S.C. § 1391 in that: (a) Defendant resides in this judicial district, and (b) a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district.

20.    As noted above, Defendant "resides" in this judicial district as a Money Services Business that willfully and knowingly transacts business here.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

21.     Furthermore, as described in greater detail herein, the theft of CRYPTSY customer funds and a substantial portion of Defendant's assistance in laundering those stolen funds occurred in this judicial district, including Defendant's transmittal of purloined funds to CRYPTSY's and Mr. Vernon's bank accounts in Florida.

22.     In light of the foregoing, this District is a proper venue in which to adjudicate this dispute.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

## Paul Vernon and Cryptsy

23.     Bitcoin is a virtual currency that may be traded on online exchanges for conventional currencies, including the U.S. Dollar, or used to purchase goods and services online. Bitcoin has no single administrator or central authority or repository.

24.     On or about January 31, 2013, Paul Vernon (a/k/a Paul "Big Vern" Vernon) ("VERNON") registered CRYPTSY as a "for profit" corporation in the State of Florida; and VERNON, by and through the corporation, began operating a website at the following web address: http://www.cryptsy.com.

25.     At all times material hereto, VERNON resided in, operated, and directed CRYPTSY from, and interacted with COINBASE from, this District.

26.     Also at all times material hereto, CRYPTSY, like COINBASE, has been registered with FinCEN as a Money Services Business.

27.     CRYPTSY, as a Money Services Business, is obligated, *inter alia*, to keep certain financial records and allow free and unfettered access to consumer accounts.  As demonstrated below, CRYPTSY has failed to do that.

- 6 -

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

28.     CRYPTSY solicited members of the public to register new accounts, deposit Bitcoin or other cryptocurrency with CRYPTSY, and thereafter actively engage in the exchange and trade of Bitcoin as well as other (alternate) cryptocurrencies.

29.     After a new user created an account, the user was provided a unique digital address (known as a "cryptocurrency wallet address").  Each new user funded his or her account by transferring cryptocurrency assets to his or her unique address provided by CRYPTSY.

30.     A user's account, once populated with a cryptocurrency balance, could buy, sell, or trade in alternative cryptocurrencies.  All denominations of account balances for a user were listed in Bitcoin denominations, commonly styled as "BTC."

<u>**Coinbase is Licensed as a Money Transmitter**</u>

31.     As noted above, COINBASE purports to provide cryptocurrency users a secure online location at which users can buy, sell, transfer, and store their digital currency.

32.     COINBASE is licensed as a Money Transmitter in multiple states and territories across the United States (including, *inter alia*, Florida), but it is not a bank.

33.     A Money Transmitter is required to maintain federal registration as a Money Services Business and comply with federal recordkeeping and reporting requirements under the auspices of FinCEN.

34.     As a Money Transmitter in the State of Florida, for example, COINBASE is authorized to transmit currency, monetary value, or payment instruments, either by wire, facsimile, electronic transfer, courier, the internet, or through bill payment services or other businesses that facilitate such transfer, within this country or to or from locations outside this country.

35.     Among the federal regulatory statutes, standards, and requirements with which a Money Services Business must comply is the Bank Secrecy Act.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

36.     Notwithstanding the foregoing, a Money Services Business (defined in 31 CFR 1010.100(ff)) is a materially different thing from a bank, which is defined in 31 CFR 1010.100(d). In fact, the Code of Federal Regulations (31 CFR 1010.100(ff)(8)(*i*)) specifically notes that the term "Money Services Business" shall not include a bank.

### Coinbase Purports to be a Champion of Consumer Protection

37.     In February 2014, Tokyo-based Mt. Gox -- one of the world's leading Bitcoin exchanges -- halted its operations, blaming the disruption on technical issues and cyber-attacks. Mt. Gox later abruptly shuttered its business and filed for bankruptcy, claiming debts (including those owed to its customers) exceeding $64,000,000.00.  Mt. Gox's precipitous tumble caused the value of Bitcoin to plunge overnight and shook users' confidence in the future stability of Bitcoin as a viable alternative currency.

38.     In the wake of Mt. Gox's collapse, COINBASE released a public statement pledging to "lead the way" in coming up with consumer-protection measures after the "tragic violation of the trust of users of Mt. Gox."  According to the statement:

- responsible Bitcoin exchanges are working together and are committed to the future of Bitcoin and the security of all customer funds.

- Bitcoin operators play a critical role over the Bitcoin they hold as assets for their customers.  Acting as a custodian should require a high bar, including appropriate security safeguards that are independently audited and tested on a regular basis.

COINBASE touted and positioned itself to be one of those "responsible Bitcoin exchanges."

39.     As set forth herein, COINBASE -- by such statements and its conduct in general -- assumed a duty to protect and safeguard the Bitcoin of its exchange customers, such as CRYPTSY.

### Cryptsy's Rise to Prominence

40.     With Mt. Gox defunct, thousands of cryptocurrency users turned to CRYPTSY as their new, trusted cryptocurrency exchange.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

41.     Barely one year after it was founded, CRYPTSY experienced significant growth in both its customer base and total online trades.  According to published reports, CRYPTSY's customer base in mid-2014 swelled to approximately 230,000 registered users; its trades per day exceeded 300,000; and it made available 150 different types of digital currencies for its users to trade.

42.     CRYPTSY's expansion, however, had its limits.  CRYPTSY did not deal with fiat money (*i.e.*, government-backed money such as the U.S. Dollar), and it needed a way to process fiat transactions for its users.

43.     As VERNON was quoted in a 2014 news report: "*Our concern is, and the government's concern is, money laundering.  So we need to kind of be the poster children of how to do [compliance] correctly.  So I'm not going to launch [a fiat currency option] until I'm ready to be on the poster*."

44.     Instead of having CRYPTSY launch its own fiat currency option, VERNON turned to COINBASE.

**Cryptsy and Vernon's Accounts at Coinbase Were Vehicles of Theft**

45.     CRYPTSY had an account in its name at COINBASE.  Likewise, VERNON had an account in his own name at COINBASE.

46.     CRYPTSY and VERNON informed COINBASE in or about July 2014 that instead of instituting a fiat currency option for CRYPTSY's customers, CRYPTSY would continue to operate its crypto-to-crypto exchanges where its fees would be collected in Bitcoin and that CRYPTSY would use COINBASE to liquidate those Bitcoin (representing a portion of CRYPTSY's revenues) into U.S. Dollars.  COINBASE knew it was the only service provider that VERNON and CRYPTSY used for such purposes.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

47.     From 2014 through 2016, CRYPTSY and VERNON transferred enough Bitcoin through COINBASE (approximately $8,300,000.00 USD) to rank among COINBASE's top liquidators of Bitcoin.

48.     COINBASE failed to perform adequate "anti-money laundering" and "know your client" (combined as "AML/KYC") procedures, as those procedures are commonly known under FinCEN guidelines and enforcement rules.

49.     From 2014 through 2016, CRYPTSY and VERNON liquidated Bitcoin through COINBASE for U.S. Dollars; however, the liquidated Bitcoin were not legitimately generated revenues.  Instead, those Bitcoin were stolen from CRYPTSY users in a long-running fraudulent scheme that since collapsed under the weight of its own ill-conceived structure.

50.     Unbeknownst to CRYPTSY users, CRYPTSY and VERNON were stealing Bitcoin from user accounts and liquidating those Bitcoin through both CRYPTSY's and VERNON's accounts at COINBASE.

51.     Typically, CRYPTSY and VERNON would remove Bitcoin from individual CRYPTSY customer wallets, transfer those Bitcoin to a CRYPTSY "hot wallet"[2] which VERNON controlled, send those purloined Bitcoin to either CRYPTSY's COINBASE account or VERNON's own COINBASE account, liquidate those Bitcoin within the respective COINBASE accounts, and then send the liquidated funds to a personal bank account at TD Bank that VERNON maintained jointly with his then-wife, Lorie Ann Nettles.

52.     Shown graphically, the following is the path CRYPTSY and VERNON typically followed to steal CRYPTSY customer assets:

---

[2] In the cryptocurrency world, a "hot wallet" is known as a bitcoin wallet that is connected to the Internet that allows for the instant payout of withdrawals on cryptocurrency exchanges.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

CRYPTSY CUSTOMER DEPOSITS FUNDS INTO
DESIGNATED CRYPTSY WALLET



CRYPTSY MIXES USER DEPOSITS INTO
SEVERAL CRYPTSY "HOT" WALLETS



VERNON TRANSFERS $8.2 MILLION IN BITCOIN TO COINBASE THROUGH
HIS PERSONAL COINBASE ACCOUNT AND CRYPTSY'S COINBASE ACCOUNT

COINBASE LIQUIDATES THE BITCOIN,
AND NOW VERNON AND THE MONEY ARE MISSING

53.    Over the course of approximately three years, CRYPTSY and VERNON deposited and liquidated $4,900,000.00 worth of Bitcoin through CRYPTSY's COINBASE account.

54.    Over the same period of time, CRYPTSY and VERNON deposited and liquidated $3,300,000.00 worth of Bitcoin through VERNON's COINBASE account.

55.    CRYPTSY and VERNON told COINBASE that the $4,900,000.00 deposited and liquidated through CRYPTSY's COINBASE account represented a portion of the revenues CRYPTSY had generated from its business, which CRYPTSY told COINBASE was the byproduct of the 0.3% transaction fee CRYPTSY assessed its customers for the value of each transaction in which the customers engaged at CRYPTSY.

56.    VERNON also told COINBASE that the $3,300,000.00 deposited and liquidated through his personal COINBASE account represented Bitcoin that VERNON himself had mined and that he personally owned.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

57.     Based on the number of assets deposited and liquidated through CRYPTSY's COINBASE account, with full knowledge that CRYPTSY charged its customers a 0.3% transaction fee on the value of each transaction, COINBASE could not have reasonably believed that CRYPTSY was conducting nearly $1,700,000,000.00 USD in cryptocurrency exchange trading business over the stated time period.

58.     Likewise, COINBASE could not have reasonably believed that VERNON had personally mined and owned the $3,300,000.00 USD he deposited and liquidated through his personal COINBASE account.

**<u>Coinbase Failed to Adequately Investigate Cryptsy and Vernon's Coinbase Accounts and Willfully Blinded Itself to Obvious Red Flags</u>**

59.     In or about June 2014, suspicions arose at COINBASE about the high volume of activity taking place in the CRYPTSY and VERNON accounts at COINBASE.

60.     Notwithstanding the regulatory requirements COINBASE faced as a Money Services Business under the FinCEN division of the U.S. Treasury Department, COINBASE merely performed a cursory review of the accounts held by CRYPTSY and VERNON and asked only a few benign questions about the suspicious activity.

61.     In response to COINBASE's perfunctory inquiry, VERNON claimed Bitcoin liquidated through his COINBASE account were his own and were derived through his personal mining efforts.

62.     Without follow-up or verification, COINBASE accepted CRYPTSY and VERNON's hollow responses.

63.     COINBASE failed to request from VERNON origination wallet addresses and a confirmation transaction to verify the veracity of his claims that he mined the Bitcoin.

**SILVER LAW GROUP**
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

64.     Had COINBASE even cursorily audited or reviewed the blockchain[3] history of the Bitcoin deposited into VERNON's COINBASE account, it would have been open and obvious to COINBASE that VERNON's statements were completely without merit.  The following examples demonstrate the open and obvious information available to COINBASE:

| | USER DEPOSITED BTC AT CRYPTSY | USER BTC TRANSFERRED TO VERNON PERSON COINBASE ACCOUNT | COINBASE LIQUIDATES BTC AND DEPOSITS IN VERNON BANK ACCOUNT |
|---|---|---|---|
| **USER A 10/9/2014** | 28[4] | 28[5] | ✓ |
| **USER B 4/14/2014** | 100[6] | 300[7] | ✓ |

[3] The blockchain is the equivalent of a shared public ledger that includes all Bitcoin transactions so that traders can confirm that sellers actually own the Bitcoins being transacted.

[4] User A sent 20 Bitcoins (f18bda97c350c829fb40cdbb48ded0af1941159ee86190b2065a14ded797aa2e) and 8 additional Bitcoins (5a141f76a4ced439e681a95952a9a42dae584686d31929a989d7ba846fcc0fd7) to Cryptsy via deposit address of 13m1FqXBh9nrfsgMKPWncoDWvv6T6f2q5K.

[5] User A's 28 BTC was then sent to VERNON's personal Coinbase account at 14ETojkW9Jif1N5XzMRYhjhgGZUimn7e3j (0150f87f4a9771ca21df81f6cae2e917a88cd530d272529e2a23f76be113ca9a).

[6] User B sent 100 Bitcoins (703f79f29df6d3932e257011418873255a2f0776afbdc4f59df502ee7640cf77) to Cryptsy via deposit address of: 12go4DtJ33UtK2zYXJ2P5nPVPjyhhRSHH9.

[7] User B's 100 Bitcoins were commingled with 9 other users' deposits totaling 300 Bitcoins and were sent to an address in VERNON's personal Coinbase account: 1UBXwWBGLtSmSLCCZs8MaTk44Q3L5H8u6 (5662e5d320aaf57e39f98c0823e54179785f1461a85e327cbac8e4e54861aa0a).

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

| | | | |
|---|---|---|---|
| **USER C** 01/20/2015 | $2^8$ | $350^9$ | ✓ |
| **USER D** 02/14/2015 | $13.5^{10}$ | $100^{11}$ | ✓ |
| **USER E** 03/16/2015 | $6^{12}$ | $20^{13}$ | ✓ |

---

[8] User C sent 2 Bitcoins (49b5443cb4adcaf9a586ca88db1d1fef3ba7e61ec69949f294f73dfe2e3cc7ca) to Cryptsy via deposit address of: 1H4iiGxAqPVh4vMPW2f2TAepD2A4S3q4M1.

[9] On January 21, 2015, User C's 2 Bitcoins were moved along with 15 other users' Bitcoin (25 total Bitcoin) to the following address: 1MSijnGgNRFKJAMweRcPCbF8whSpdyDUkm (2ed18eb2d96e241391a5b24d519d3591918330ea12e622471af3497c46c5a64e).

Two days later -- on January 23, 2015 -- those 25 Bitcoin were combined with 14 other similar transactions totaling 350 Bitcoin from the address 1MSijnGgNRFKJAMweRcPCbF8whSpdyDUkm.  Those 350 Bitcoin were all moved to an address in VERNON's personal Coinbase account: 14ETojkW9Jif1N5XzMRYhjhgGZUimn7e3j.

[10] User D sent 10 Bitcoin (79f320476e7b92c3ba522195dac63b180c4cd7090327ad55795231848cca5bd5) and 3.5185 Bitcoin (da5d393e3751469a9e55ba3601e5068856c8c9361155a4fdf13a06fe1016b30d) to Cryptsy via the following deposit address: 15GgUD9rfEUFktuoeQ3cQmQjvtWx81aAhW.

[11] On February 15, 2015, User D's Bitcoins were commingled with 60 other users' deposits totaling 100 Bitcoin and were moved to an address in VERNON's personal Coinbase account: 1EzK7T326C3eU3pi4MWFDzUptg143vV4K5 (ed04e92706a0d7aa635dc2a363ffcb3fae7ce8267f2b166ab047a13f6366e5b6).  That same day, those 100 Bitcoin were sold; and $22,216.76 was deposited into VERNON's personal bank account at TD Bank in Florida.

[12] User E sent 6.5 Bitcoins (c3ebb5d291b7b2d7767fec0ff232f2a048b4bd63597c19f0a54ac74f3d91afe7) to Cryptsy via deposit address of: 1B4c4MwjwoSfayteqQdtP9EePVhHvtjFNH.

[13] Also on March 16, 2015, User E's Bitcoin were moved along with 5 other users' deposits (20 Bitcoin in all) to the following address in VERNON's personal Coinbase account: 1Naz8JLF8STQbZ9hqAVn8wej8pMKGW5v1x (8d4497e13aac272c5f6ea0cf70f0f11e70507f357a0a55d216e8e64006603575).  Later that day, the 20 Bitcoin were sold; and $5,798.45 was deposited into VERNON's personal bank account at TD Bank in Florida.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

65.     For CRYPTSY and VERNON, COINBASE made specific exceptions to its internal procedures; because CRYPTSY and VERNON were "high volume" customers, as evidenced in internal communications at COINBASE.

66.     COINBASE purposely conducted a curtailed and inadequate investigation of CRYPTSY and VERNON's activities because COINBASE was making a large profit from CRYPTSY and VERNON's COINBASE transactions.

67.     COINBASE knew its investigation into CRYPTSY and VERNON was inadequate and accepted that inadequacy in favor of its own profit, turning a blind eye to CRYPTSY's and VERNON's fraudulent scheme, knowing all the while that at such time COINBASE was in a position to know of such unlawful conduct.

68.     It was not until almost a year-and-a-half later (October 2015) that COINBASE terminated CRYPTSY and VERNON's accounts at COINBASE in view of some media reports detailing wrongdoing taking place at CRYPTSY.

69.     Before COINBASE terminated CRYPTSY and VERNON's accounts at COINBASE, though, CRYPTSY and VERNON were able to convert approximately $8,200,000.00 of assets from CRYPTSY users – laundering those assets through COINBASE so that CRYPTSY and VERNON could convert assets in CRYPTSY customer accounts into cash in VERNON's personal bank account.

70.     COINBASE had a unique window into CRYPTSY and VERNON's scheme and watched it play out as millions of dollars' worth of Bitcoin were stolen from CRYPTSY customers.

**Coinbase Aided and Abetted Cryptsy and Vernon's Theft**

71.     COINBASE knew or should have known that the assets being liquidated through its exchange did not rightfully belong to either CRYPTSY or VERNON.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

72.     COINBASE knew or should have known that the assets being liquidated through its exchange were not profits garnered by CRYPTSY in the normal operation of its business.

73.     Instead, COINBASE knew, or should have known, that the assets being liquidated through its exchange belonged to CRYPTSY account holders and were being converted by CRYPTSY and VERNON.

74.     COINBASE turned a blind eye to the crimes that it facilitated.  COINBASE provided an array of essential liquidation services as a Money Services Business to CRYPTSY and VERNON with the knowledge that it was enabling CRYPTSY and VERNON to commit crimes and convert CRYPTSY client assets.

75.     COINBASE's services served as a vital element of CRYPTSY and VERNON's fraudulent scheme, and COINBASE was aware of its complicity in the fraud.

76.     COINBASE knew that it was required by federal law to disclose and report CRYPTSY and VERNON's activities to law enforcement authorities and federal regulators, including FinCEN.  However, to preserve its own profitable participation in CRYPTSY and VERNON's scheme -- from which COINBASE received fees -- COINBASE knowingly turned a blind eye to CRYPTSY and VERNON's criminal activities until, in late-2015, COINBASE ultimately decided to terminate its relationship with CRYPTSY and VERNON.

77.     COINBASE had the power, which it exercised, to control the general affairs of CRYPTSY and VERNON during the relevant time period and had the power, which it exercised, to directly or indirectly control or influence the specific transactions of CRYPTSY and VERNON which resulted in their primary violations of law.

78.     COINBASE also had the duty to stop CRYPTSY and VERNON's crimes, yet it refused to do so because COINBASE was more interested in enriching itself, even if it meant

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

furthering CRYPTSY and VERNON's crimes and allowing CRYPTSY and VERNON to cause massive financial losses to hundreds if not thousands of CRYPTSY users -- many of whom are COINBASE customers as well.

79.     As a Money Services Business, COINBASE has strict obligations under the Currency and Foreign Transactions Reporting Act of 1970 a/k/a the Bank Secrecy Act (the "BSA") to monitor customer transactions and report any suspicious activities to law enforcement authorities.  *See* 31 U.S.C. § 5311; 12 C.F.R. § 208.63.  The USA Patriot Act of 2001 (the "Patriot Act") reinforced this obligation and underscored the importance of implementing robust internal systems to detect and report money laundering and other suspicious activities.  The regulations promulgated pursuant to the Patriot Act require financial institutions to institute an anti money-laudering ("AML") program that includes four pillars: (i) designating an individual or individuals responsible for managing BSA compliance; (ii) a system of policies, procedures, and internal controls to ensure ongoing compliance; (iii) training for appropriate personnel; and (iv) independent testing of compliance.  12 C.F.R. § 208.63.

80.     For Money Services Businesses to comply with these obligations, the institutions have a legal obligation to fully understand their customer's business.  This "know your customer" ("KYC") duty is imposed pursuant to 12 C.F.R. § 208.62.  Institutions viewing account activity need a baseline against which to distinguish account activity that may be normal for a particular industry from account activity that might suggest an illegal enterprise.  The KYC duty pre-dated the Patriot Act.  Not only was it suggested by such guidelines as the Federal Reserve's BSA Examination Manual of 1995 and Supervisory Letter on Private Banking Activities, SR 97-19 (SUP), but it was standard industry practice.

81.     At all relevant times, CRYPTSY and VERNON used COINBASE as their primary liquidator and deposited and liquidated the stolen CRYPTSY client assets through CRYPTSY and VERNON's COINBASE accounts.

82.     Until late-2015 -- at which time COINBASE finally closed CRYPTSY and VERNON's accounts -- CRYPTSY and VERNON liquidated and laundered over $8 Million representing Plaintiffs' and other CRYPTSY customers' assets.

83.     COINBASE knew that the activity being undertaken by CRYPTSY and VERNON was illegal.  When COINBASE asked CRYPTSY and VERNON for information corroborating the legitimacy of the high volume of assets that were flowing through CRYPTSY and VERNON's COINBASE accounts, CRYPTSY and VERNON gave patently ridiculous explanations that no reasonable Money Services Business would accept.

84.     Despite the lack of credibility in the responses given, COINBASE took no steps for approximately 18 months to shut CRYPTSY and VERNON out as COINBASE customers or to expose the illegal activities to law enforcement authorities.

85.     No matter how inexplicable the transaction, COINBASE dutifully and unflinchingly executed every single request from CRYPTSY and VERNON during the relevant time period; and COINBASE profited on a daily basis from the criminal conduct.  CRYPTSY and VERNON were maintaining account balances preposterously suggesting that they owned and controlled assets approaching $1,700,000,000.00 in value, and COINBASE did not have the institutional moral fiber to turn down a customer who could offer the profits COINBASE could generate from those account balances.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

## Coinbase Eagerly Became Cryptsy and Vernon's Co-Conspirator

86.     To run their illegal scheme, CRYPTSY and VERNON needed a Money Services Business to: (a) provide a depository for the pilfered Bitcoin, (b) liquidate the stolen Bitcoin, and (c) provide CRYPTSY customers with a sense that CRYPTSY was operating a legitimate business.

87.     What CRYPTSY and VERNON also needed was a Money Services Business that would be hospitable to fraudsters -- that is, an MSB that, for a price, was willing to overlook CRYPTSY and VERNON's suspicious activity, ignore the excessive account activity, and ignore its own obligations under federal law.

88.     COINBASE ignored the fact that the activity in CRYPTSY and VERNON's COINBASE accounts was grossly excessive and purported to represent an inordinate share of the Bitcoin market.

89.     Additionally, COINBASE ignored the simple verification process that the blockchain -- which is the immutable backbone of cryptocurrency -- provided.

90.     COINBASE failed to verify that the Bitcoin being presented by CRYPTSY and VERNON actually derived from legitimate sources -- something that could have been easily verified.

91.     In or about June 2014, COINBASE requested information from VERNON as to the source of Bitcoin deposited into VERNON's COINBASE account.

92.     Shortly thereafter, VERNON replied, stating that the Bitcoin originated from his activities prior to CRYPTSY and were from his own mining activities.

93.     Under the Bank Secrecy Act, COINBASE has a duty to inquire and/or report if suspicious activity is involved in transmitting money.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

94.     COINBASE often and repeatedly transmitted money for CRYPTSY and VERNON.

95.     COINBASE received money from VERNON and converted it into Bitcoin.

96.     Upon information and belief, from May 21, 2013 to December 4, 2015, VERNON initiated over 800 transactions that obligated COINBASE to make some form of inquiry as to the legitimacy and legality of the transaction, and COINBASE routinely failed to make the necessary inquiry, *to wit*:

> (a) COINBASE received two transactions from VERNON, each exceeding $100,000.00 in value, and made no inquiry,
>
> (b) COINBASE received eight transactions from VERNON, each between $50,000.00 and $84,000.00 in value, and made no inquiry,
>
> (c) COINBASE received 33 transactions from VERNON, each between $20,000.00 and $49,999.00 in value, and made no inquiry,
>
> (d) COINBASE received 56 transactions from VERNON, each between $10,000.00 and $19,999.00 in value, and made no inquiry, and
>
> (e) COINBASE received 115 transactions from VERNON, each between $3,000.00 and $9,999.00 in value, and made no inquiry.

97.     On or about June 14, 2014, the date of COINBASE's request for information from VERNON and CRYPTSY, COINBASE had processed no less than 8,293 Bitcoin through VERNON's personal account.  VERNON's COINBASE account had a balance of .04 Bitcoin and $40,916.00 U.S. Dollars.

98.     As of June 14, 2014, COINBASE had processed $1,222,788.00 USD of value through VERNON's account and sent **only one** e-mail inquiry to VERNON and CRYPTSY.

99.     From June 14, 2014 until the time COINBASE finally closed VERNON's account, COINBASE processed no less than 26,516 Bitcoin through VERNON's personal COINBASE account.

Silver Law Group
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

100.    From June 14, 2014 until the time COINBASE finally closed VERNON's account, COINBASE processed no less than $6,007,155.00 USD of value through VERNON's account while liquidating over $3,000,000.00 USD into VERNON's personal TD Bank account in Florida.

101.    At any point in time, with the power of the Blockchain ledger at COINBASE's disposal, and with the additional benefit of knowing the starting point of a transaction (VERNON's COINBASE wallet), COINBASE could have looked back at every transaction leading up to the deposit into VERNON's account to verify that the items being liquidated were legitimately sourced.

102.    As an example of the information available to COINBASE:

(a) On or about October 13, 2014, VERNON transferred 150 Bitcoin into his COINBASE wallet (address 14ETojkW9Jif1N5XzMRYhjhgGZUimn7e3j – hereinafter the "VERNON COINBASE WALLET").

(b) The transfer was completed and recorded in the Bitcoin blockchain and is easily searchable on the internet through tools such as https://blockchain.info, an internet website used to access information in the Bitcoin blockchain.

(c) The aforementioned transaction identification, or "hash," is 79b5acc1e60828b5b5c684aa2c7c88ba9f08d51218d33ac952f2239624c29953

(d) A simple entry of the aforementioned "hash" into the search bar at https://blockchain.info would reveal that the 150 Bitcoin came from one wallet address: 1MSijnGgNRFKJAMweRcPCbF8whSpdyDUkm (hereinafter the "CRYPTSY DUkm WALLET" or "DUkm")."

(e) Upon information and belief, the DUkm wallet was a "Hot Wallet" used to store CRYPTSY client funds.

(f) Using https://blockchain.info, any user could click on the DUkm wallet address and discover that over 2,000 BTC have traveled through that wallet.

(g) As of October 2014, when 150 BTC (over $50,000.00 USD) was transferred into the VERNON COINBASE WALLET, an examination of the CRYPTSY DUkm WALLET would have revealed nearly a

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

thousand micro transactions, consolidating fractions of Bitcoin into larger sums of 5, 10, or 25 Bitcoin at a time.  By way of analogy, this would be akin to an automated account sweep.  For example:

1) Customer A deposits .45 BTC into his CRYTPSY account.

2) Customer B deposits .01 BTC into her CRYPTSY account.

3) Customers C through Z deposit a total of 4.54 BTC into their own individual CRYPTSY accounts.

4) CRYPTSY would take all BTC from all accounts simultaneously and move them into the CRYPTSY DUkm WALLET.

103.    COINBASE not only would have been able to verify the source and destination of each transaction, but would have been able to see that VERNON sent $250,000.00 in BTC transactions to VERNON's COINBASE wallet in less than a month.

104.    Vernon told COINBASE that he derived his funds from mining activities; however, none of the transactions within 35 links of funds in the DUkm wallet were mined coins.

105.    Freshly mined Bitcoins appear in the blockchain with the identifying label "No Inputs (Newly Generated Coins)" as follows[14]:



---

[14] None of the coins listed below were involved in any transaction alleged.  The transaction is simply included as a demonstration to disprove VERNON's patently false statements.

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

106.     Every transaction COINBASE received from VERNON into a COINBASE wallet could have been researched and evaluated as demonstrated above.

107.     It was not reasonable, during the time VERNON was moving Bitcoin into the VERNON COINBASE WALLET, for COINBASE to believe that the transactions it received were a result of anything other than aggregated account sweeps from CRYPTSY customers in light of the fact that COINBASE knew that VERNON controlled CRYPTSY account funds.

**Coinbase Quietly Terminated Cryptsy and Vernon's Accounts**

108.     In October 2015, a media report asserted that the U.S. Securities and Exchange Commission, the Internal Revenue Service, FinCEN, the Department of Homeland Security, and other governmental agencies had officially launched multiple investigations into CRYPTSY's business operations under heightened suspicions that CRYPTSY was engaged in a wide-spread fraudulent scheme for inappropriately gained licenses, market manipulation, selling unlicensed securities, money laundering, and many other financial violations.

109.     In response to the information set forth in the article, COINBASE inquired of CRYPTSY and VERNON whether the allegations were true.

110.     Despite CRYPTSY and VERNON's denial of the allegations, COINBASE quietly terminated CRYPTSY and VERNON's accounts within days of the media report's release.

111.     COINBASE did not disclose to any of the governmental authorities purportedly investigating CRYPTSY the results of COINBASE's own investigation into the allegations in the article.

112.     COINBASE also made no public statement that it had repudiated its relationship with CRYPTSY and VERNON or that it had reported to the governmental authorities any suspicious activity of CRYPTSY and VERNON.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

113.    COINBASE simply employed a quiet exit strategy that separated itself from CRYPTSY and VERNON while seeking to shield itself from scrutiny of its own.

114.    Such scrutiny is well-deserved, though, as CRYPTSY and VERNON's theft would not have succeeded without cooperation and assistance from COINBASE.

## FACTS SPECIFIC TO INVESTOR PLAINTIFFS

115.    Plaintiff LEIDEL, on August 13, 2014, deposited 3.9409 BTC to initially fund his CRYPTSY account.  The value of that deposit was approximately $2,112.32.

## CLASS ALLEGATIONS

116.    A class action is the proper form to bring Class Plaintiffs' claims under FRCP 23. The potential class is so large that joinder of all members would be impractical.  Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the class.

117.    Class Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all members of the following class:

> **All CRYPTSY account owners who: (1) deposited Bitcoins, alternative cryptocurrencies, or any other form of monies or currency at CRYPTSY, (2) had such currency liquidated by VERNON and CRYPTSY through COINBASE, and (3) have been denied access to their accounts and funds between May 22, 2014 and the present date.  The Class asserts claims under California law as set forth in Counts I-IV below.**

118.    This action satisfies all of the requirements of Federal Rules of Civil Procedure, including numerosity, commonality, predominance, typicality, adequacy, and superiority.

## Numerosity

119.    Members of the Class are so numerous and geographically dispersed that joinder of all members is impractical.

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

120.     While the exact number of class members remains unknown at this time, upon information and belief, there are at least hundreds if not thousands of putative Class members.

121.     Again, while the exact number is not known at this time, it is easily and generally ascertainable by appropriate discovery.

122.     It is impractical for each class member to bring suit individually.

123.     Class Plaintiffs do not anticipate any difficulties in managing this action as a class action.

<u>**Commonality and Predominance**</u>

124.     There are many common questions of law and fact involving and affecting the parties to be represented.

125.     When determining whether common questions predominate, courts focus on the issue of liability; and if the issue of liability is common to the class and can be determined on a class-wide basis, as in the instant matter, common questions will be held to predominate over individual questions.

126.     Common questions include, but are not limited to, the following:

(a) Whether COINBASE has converted the funds belonging to Class Plaintiffs and the Class Members;

(b) Whether COINBASE owed duties to Class Plaintiffs and the Class, what the scope of those duties were, and whether COINBASE breached those duties;

(c) Whether COINBASE's conduct was unfair or unlawful;

(d) Whether COINBASE aided and abetted CRYPTSY's breach of fiduciary duties;

(e) Whether COINBASE breached its duty of reasonable care as a money services business and a member of FinCEN;

(f) Whether COINBASE has been unjustly enriched;

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

(g) Whether Class Plaintiffs and the Class have sustained damages as a result of COINBASE's conduct; and

(h) Whether Class Plaintiffs and the Class are entitled to injunctive relief.

127.    These common questions of law or fact predominate over any questions affecting only individual members of the Class.

### Typicality

128.    Class Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all members of the Class were injured through the common misconduct described above and were subject to Defendant's unfair and unlawful conduct.

129.    Class Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all members of the Class.

### Adequacy of Representation

130.    Class Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class.

131.    Class Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in complex consumer class action litigation of this nature, to represent them.

132.    Class Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class.

133.    The infringement of the rights and the damages Class Plaintiffs have each suffered are typical of other Class members.

134.    To prosecute this case, Class Plaintiffs have chosen the law firms of Silver Law Group and Wites & Kapetan, P.A.  These firms are experienced in class action litigation and have

the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

<div align="center">**Superiority**</div>

135.    Class action litigation is an appropriate method for fair and efficient adjudication of the claims involved herein.

136.    Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; as it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require.

137.    Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a well-funded corporate defendant like COINBASE.

138.    Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical.

139.    The nature of this action and the nature of laws available to Class Plaintiffs make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Class Plaintiffs and the Class for the wrongs alleged because:

> (a) Defendant would necessarily gain an unconscionable advantage if it were allowed to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources;
>
> (b) The costs of individual suits could unreasonably consume the amounts that would be recovered;
>
> (c) Proof of a common course of conduct to which Class Plaintiffs were each exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged;

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

(d) Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

(e) The Class Members are geographically dispersed all over the world, thus rendering it inconvenient and an extreme hardship to effectuate joinder of their individual claims into one lawsuit;

(f) There are no known Class Members who are interested in individually controlling the prosecution of separate actions; and

(g) The interests of justice will be well served by resolving the common disputes of potential Class Members in one forum.

140. Class Plaintiffs reserve the right to modify or amend the definition of the proposed class and to modify, amend, or create proposed subclasses before the Court determines whether certification is appropriate and as the parties engage in discovery.

141. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

142. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

143. As a result of the foregoing, Class Plaintiffs and the Class Members have been damaged in an amount that will be proven at trial.

## FACTS SPECIFIC TO THE RECEIVER

144. The Receiver is the duly appointed and acting Receiver/Corporate Monitor for CRYPTSY.

145. VERNON has been ousted from control of, and no longer maintains any beneficial interest in, CRYPTSY.

146. CRYPTSY is no longer VERNON's "evil zombie," focused on doing harm to its account holders and stealing from them the cryptocurrency they had entrusted to CRYPTSY.

147.     The Receiver is not bound by VERNON's improper actions in engineering the fraud perpetrated upon CRYPSTY account holders.

148.     The Receiver is prosecuting this action on behalf of the individual claimholders whose assets were stolen by the since-removed VERNON, who dominated CRYPTSY and used the company for his own illegal purposes.

149.     Plaintiffs and the Receiver have duly performed all of their duties and obligations, and any conditions precedent to Plaintiffs and the Receiver bringing this action have occurred, have been performed, or else have been excused or waived.

150.     To enforce their rights, Plaintiffs and the Receiver have retained undersigned counsel and are obligated to pay counsel a reasonable fee for its services, for which Defendant is liable as a result of its bad faith and otherwise.

## COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### [Class Plaintiffs against Defendant]

Class Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-143 and 149-150 above, and further allege:

151.     CRYPTSY breached its fiduciary duties to Plaintiffs and the Class Members, as set forth above.

152.     COINBASE knew that CRYPTSY owed fiduciary and other obligations to Plaintiffs and the Class Members.

153.     COINBASE knew that CRYPTSY was breaching its fiduciary and other obligations to Plaintiffs and the Class Members by engaging in the conduct alleged above.

154.     With such knowledge, COINBASE knowingly participated, aided and abetted, and otherwise substantially assisted to bring about CRYPTSY's breach of fiduciary obligations.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

155.    COINBASE rendered substantial and knowing assistance to CRYPTSY in its breach of fiduciary duties by, among other things: (a) providing monetary services to CRYPTSY and CRYPTSY's users, (b) disregarding overtly suspicious activity indicative of misconduct, (c) clearing exorbitant amounts of cryptocurrency for CRYPTSY that put CRYPTSY among COINBASE's highest volume users, (d) failing to report to governmental and regulatory authorities incidents of excessive activity in CRYPTSY's COINBASE account, (e) vouching for CRYPTSY in letters while withholding the fact that CRYPTSY was mishandling CRYPTSY investor funds, and (f) sitting silently while CRYPTSY made numerous false and misleading material omissions related to the funds custodised by CRYPTSY for its account holders -- including Plaintiffs and the Class Members -- knowing that Plaintiffs and the Class Members would rely on those material omissions to their detriment.

156.    COINBASE's wrongful conduct was done purposefully and maliciously or recklessly, without regard for the rights and interests of Plaintiffs and the Class Members.

157.    As a direct and proximate cause of COINBASE's conduct, Plaintiffs and the Class Members have been damaged.

## COUNT II – AIDING AND ABETTING CONVERSION
### [Class Plaintiffs against Defendant]

Class Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-143 and 149-150 above, and further allege:

158.    VERNON asserted dominion and control over the property of CRYPTSY's account holders by misappropriating and then liquidating for his own personal use and benefit through the COINBASE accounts maintained by CRYPTSY and VERNON assets belonging to CRYPTSY account holders.

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

159.     COINBASE had actual and/or constructive knowledge of CRYPTSY and VERNON's acts in misappropriating CRYPTSY customer assets by virtue of the suspicious, excessive, and unverifiable activity which was transacted through CRYPTSY and VERNON's accounts at COINBASE.

160.     COINBASE rendered substantial assistance to CRYPTSY and VERNON by ignoring its own internal policies and procedures and by violating the federal regulations with which COINBASE, as a Money Services Business, had to comply, as more fully identified above.

161.     As a direct and proximate cause of COINBASE's conduct, Plaintiffs and the Class Members have been damaged.

## COUNT III – NEGLIGENCE
### [Class Plaintiffs against Defendant]

Class Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-143 and 149-150 above, and further allege:

162.     COINBASE owed Plaintiffs and the Class Members a duty of care to use reasonable care in performing its duties as a depository of CRYPTSY and VERNON's accounts, including, among other things, the duty to: (a) properly open, establish, and maintain CRYPTSY and VERNON's accounts at COINBASE; (b) ensure that no unauthorized transfers or withdrawals from CRYPTSY and VERNON's COINBASE accounts were implemented or paid; (c) monitor CRYPTSY and VERNON's COINBASE accounts for excessive or suspicious activity; and (d) comply with all other reporting requirements applicable to CRYPTSY and VERNON's COINBASE accounts under state and federal law.

163.     COINBASE breached those duties by failing to: (a) perform its obligations, including by failing to ensure that no unauthorized transfers or withdrawals from CRYPTSY and VERNON's COINBASE accounts were implemented or paid; (b) acknowledge, report, and

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

prevent misappropriation in CRYPTSY and VERNON's COINBASE accounts through withdrawals and transfers; (c) conduct reasonable inquiry into the activities in CRYPTSY and VERNON's COINBASE accounts even though aware of serious irregularities and excessive activity; and (d) failing to comply with all other reporting requirements applicable to CRYPTSY and VERNON's COINBASE accounts under state and federal law.

164.    As a direct and proximate cause of COINBASE's conduct, Plaintiffs and the Class Members have been damaged.

## COUNT IV – UNJUST ENRICHMENT
### [Class Plaintiffs against Defendant]

Class Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1-143 and 149-150 above, and further allege:

165.    Class Plaintiffs and the proposed Class conferred a benefit upon COINBASE by depositing valuable cryptocurrency into CRYPTSY's care, which COINBASE knew or should of known was being stolen by VERNON and CRYPTSY and liquidated at COINBASE for the benefit of VERNON.

166.    As a result of COINBASE's unfair, misleading, and unlawful conduct alleged herein, COINBASE has unjustly received and retained benefits at the expense of Class Plaintiffs and the proposed Class.

167.    Under principles of equity and good conscience, COINBASE should not be permitted to retain valuable funds belonging to Class Plaintiffs and the proposed Class that they unjustly received as result of COINBASE's unfair, misleading, and unlawful conduct alleged herein without providing compensation to Class Plaintiffs and the proposed Class.

168.    Class Plaintiff and the proposed Class have suffered financial loss as a direct and proximate result of COINBASE's conduct.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

169.     Class Plaintiffs and proposed Class Members are entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by COINBASE and for such other relief that this Court deems proper.

## COUNT V – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### [Receiver against Defendant]

Receiver re-alleges, and adopts by reference herein, Paragraphs 1-114 and 144-150 above, and further alleges:

170.     CRYPTSY breached its fiduciary duties to Receiver as set forth above.

171.     COINBASE knew that CRYPTSY owed fiduciary and other obligations to Receiver.

172.     COINBASE knew that CRYPTSY was breaching its fiduciary and other obligations to Receiver by engaging in the conduct alleged above.

173.     With such knowledge, COINBASE knowingly participated, aided and abetted, and otherwise substantially assisted to bring about CRYPTSY's breach of fiduciary obligations.

174.     COINBASE rendered substantial and knowing assistance to CRYPTSY in its breach of fiduciary duties by, among other things: (a) providing monetary services to CRYPTSY and CRYPTSY's users, (b) disregarding overtly suspicious activity indicative of misconduct, (c) clearing exorbitant amounts of cryptocurrency for CRYPTSY that put CRYPTSY among COINBASE's highest volume users, (d) failing to report to governmental and regulatory authorities incidents of excessive activity in CRYPTSY's COINBASE account, (e) vouching for CRYPTSY in letters while withholding the fact that CRYPTSY was mishandling CRYPTSY investor funds, and (f) sitting silently while CRYPTSY made numerous false and misleading material omissions related to the funds custodised by CRYPTSY for its account holders --

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

including Receiver -- knowing that Receiver would rely on those material omissions to their detriment.

175.    COINBASE's wrongful conduct was done purposefully and maliciously or recklessly, without regard for the rights and interests of Receiver.

176.    As a direct and proximate cause of COINBASE's conduct, Receiver has been damaged.

## COUNT VI – AIDING AND ABETTING CONVERSION
### [Receiver against Defendant]

Receiver re-alleges, and adopts by reference herein, Paragraphs 1-114 and 144-150 above, and further alleges:

177.    VERNON asserted dominion and control over the property of CRYPTSY's account holders by misappropriating and then liquidating for his own personal use and benefit through the COINBASE accounts maintained by CRYPTSY and VERNON assets belonging to CRYPTSY account holders.

178.    COINBASE had actual and/or constructive knowledge of CRYPTSY and VERNON's acts in misappropriating CRYPTSY customer assets by virtue of the suspicious, excessive, and unverifiable activity which was transacted through CRYPTSY and VERNON's accounts at COINBASE.

179.    COINBASE rendered substantial assistance to CRYPTSY and VERNON by ignoring its own internal policies and procedures and by violating the federal regulations with which COINBASE, as a Money Services Business, had to comply, as more fully identified above.

180.    As a direct and proximate cause of COINBASE's conduct, Receiver has been damaged.

SILVER LAW GROUP
11780 West Sample Road · Coral Springs, Florida 33065 · Telephone (954) 755-4799 · Facsimile (954) 755-4684
www.silverlaw.com

## COUNT VII – NEGLIGENCE
### [Receiver against Defendant]

Receiver re-alleges, and adopts by reference herein, Paragraphs 1-114 and 144-150 above, and further alleges:

181.   COINBASE owed Receiver a duty of care to use reasonable care in performing its duties as a depository of CRYPTSY and VERNON's accounts, including, among other things, the duty to: (a) properly open, establish, and maintain CRYPTSY and VERNON's accounts at COINBASE; (b) ensure that no unauthorized transfers or withdrawals from CRYPTSY and VERNON's COINBASE accounts were implemented or paid; (c) monitor CRYPTSY and VERNON's COINBASE accounts for excessive or suspicious activity; and (d) comply with all other reporting requirements applicable to CRYPTSY and VERNON's COINBASE accounts under state and federal law.

182.   COINBASE breached those duties by failing to: (a) perform its obligations, including by failing to ensure that no unauthorized transfers or withdrawals from CRYPTSY and VERNON's COINBASE accounts were implemented or paid; (b) acknowledge, report, and prevent misappropriation in CRYPTSY and VERNON's COINBASE accounts through withdrawals and transfers; (c) conduct reasonable inquiry into the activities in CRYPTSY and VERNON's COINBASE accounts even though aware of serious irregularities and excessive activity; and (d) failing to comply with all other reporting requirements applicable to CRYPTSY and VERNON's COINBASE accounts under state and federal law.

183.   As a direct and proximate cause of COINBASE's conduct, Receiver has been damaged.

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

## COUNT VIII – UNJUST ENRICHMENT
### [Receiver against Defendant]

Receiver re-alleges, and adopts by reference herein, Paragraphs 1-114 and 144-150 above, and further alleges:

184. Receiver and the proposed Class conferred a benefit upon COINBASE by depositing valuable cryptocurrency into CRYPTSY's care, which COINBASE knew or should of known was being stolen by VERNON and CRYPTSY and liquidated at COINBASE for the benefit of VERNON.

185. As a result of COINBASE's unfair, misleading, and unlawful conduct alleged herein, COINBASE has unjustly received and retained benefits at the expense of Receiver.

186. Under principles of equity and good conscience, COINBASE should not be permitted to retain valuable funds belonging to Class Receiver and the proposed Class that they unjustly received as result of COINBASE's unfair, misleading, and unlawful conduct alleged herein without providing compensation to Receiver.

187. Receiver has suffered financial loss as a direct and proximate result of COINBASE's conduct.

188. Receiver is entitled to restitution of, disgorgement of, and/or the imposition of a constructive trust upon all profits, benefits, and other compensation obtained by COINBASE and for such other relief that this Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Class Plaintiffs, individually and on behalf of all others similarly situated, and the Receiver, respectfully pray for relief as follows:

(a) A declaration from this Court that this action is a proper class action, including certification of the proposed Class, appointment of Class Plaintiffs as class representatives, and appointment of Class Plaintiffs' counsel as class counsel;

SILVER LAW GROUP
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

(b) A judgment awarding Class Plaintiffs and the Class Members, and the Receiver, restitution, including, without limitation, disgorgement of all profits and unjust enrichment that Defendant obtained as a result of its unlawful, unfair, and unlawful business practices and conduct;

(c) A judgment awarding Class Plaintiffs and the Class Members, and the Receiver, actual compensatory damages;

(d) A judgment awarding Class Plaintiffs and the Class Members, and the Receiver, exemplary and punitive damages for Defendant's knowing, willful, and intentional conduct;

(e) Pre-judgment and post-judgment interest;

(f) Attorneys' fees, expenses, and the costs of this action; and

(g) All other and further relief as this Court deems necessary, just, and proper.

## PLAINTIFFS' DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs and the Receiver demand trial by jury in this action of all issues so triable.

Respectfully submitted,

**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:      (954) 755-4799
Facsimile:      (954) 755-4684

By: _____
        DAVID C. SILVER
        Florida Bar No. 572764
        E-mail:  DSilver@silverlaw.com
        SCOTT L. SILVER
        Florida Bar No. 095631
        E-mail:  SSilver@silverlaw.com
        JASON S. MILLER
        Florida Bar No. 072206
        E-mail:  JMiller@silverlaw.com
            - and -

**WITES & KAPETAN, P.A**.
4400 N. Federal Highway
Lighthouse Point, Florida 33064
Telephone:     (954) 570-8989
Facsimile:     (954) 354-0205
MARC A. WITES
Florida Bar No. 024783
E-mail: mwites@wklawyers.com

*Counsel for Plaintiffs and James D. Sallah, Esq.,*
*as Receiver/Corporate Monitor of*
*Project Investors, Inc. d/b/a Cryptsy*

Dated:  December 13, 2016

**SILVER LAW GROUP**
11780 West Sample Road • Coral Springs, Florida 33065 • Telephone (954) 755-4799 • Facsimile (954) 755-4684
www.silverlaw.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 9:16-cv-80060-MARRA

BRANDON LEIDEL, individually, and
MICHAEL WILSON, individually, and on behalf
of All Others Similarly Situated,

      Plaintiffs,

v.

PROJECT INVESTORS, INC. d/b/a CRYPTSY, a Florida corporation,
PAUL VERNON, individually, and
LORIE ANN NETTLES, individually,

      Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' RENEWED MOTION
## FOR APPOINTMENT OF JAMES D. SALLAH, ESQ. AS RECEIVER/CORPORATE MONITOR OVER DEFENDANT, PROJECT INVESTORS, INC. d/b/a CRYPTSY

**WHEREAS**, Plaintiffs, BRANDON LEIDEL and MICHAEL WILSON, individually, and on behalf of all others similarly situated  (collectively "Plaintiffs"), have filed a Renewed Motion for Appointment of James D. Sallah, Esq. as Receiver/Corporate Monitor over Defendant, Project Investors, Inc. d/b/a Cryptsy [DE 18] (the "Motion");

**WHEREAS**, a receiver or corporate monitor is requested with full and exclusive power, duty and authority to administer and manage the business affairs, funds, assets, choses in action and any other property of Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"); marshal and safeguard all of Cryptsy's assets; and take whatever actions are necessary for the protection of Cryptsy investors and customers;

**WHEREAS**, Plaintiffs have submitted the credentials of a candidate to be appointed as receiver or corporate monitor for Cryptsy, including its assets, properties, books and records and



<span style="color:red">**EXHIBIT "A"**</span>

other items of Cryptsy as described below, and the candidate is prepared to assume this responsibility if so ordered by this Court;

**WHEREAS**, this Court has subject matter jurisdiction over this action and personal jurisdiction over Cryptsy.  Venue properly lies in this Court;

**WHEREAS**, Defendants Project Investors Inc., d/b/a Cryptsy and Lorie Ann Nettles have been served with process and have appeared in this case or have been defaulted as of this Order; while Defendant Paul Vernon, individually, has not been yet served or appeared;

**WHEREAS**, this Court conducted a hearing on the Motion on March 28, 2016, at which time Defendant, Lorie Ann Nettles, through counsel, represented that she has no objection to the Motion or the appointment of a receiver or corporate monitor;

**WHEREAS**, Plaintiffs have made a sufficient and proper showing in support of the Motion and the appointment of a receiver or corporate monitor; and

**IT IS THEREFORE ORDERED AND ADJUDGED** as follows:

### I. Appointment of Receiver/Corporate Monitor

1.      The appointment of a receiver or corporate monitor for Cryptsy is appropriate.

2.      Until further Order of this Court, James D. Sallah, Esq. is hereby approved and appointed to serve as the Receiver/Corporate Monitor (interchangeably referred to herein as "Receiver" or "Corporate Monitor" or "Receiver/Corporate Monitor") for Cryptsy and its subsidiaries, successors and assigns.

### II. Asset Freeze

3.      This Court hereby takes exclusive jurisdiction and possession of the assets, of whatever kind and wherever situated, of Cryptsy for the purpose of preserving its assets.

4. Except as otherwise specified herein, all assets of Cryptsy are frozen until further Order of this Court. Accordingly, all persons and entities with direct or indirect control over any assets of Cryptsy, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating, or otherwise disposing of, or withdrawing, such assets. This freeze shall include, but not be limited to, assets of Cryptsy that are on deposit with financial institutions such as banks, cryptocurrency exchanges, clearing firms or any other third party.

**III. General Powers and Duties**

5. The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers or directors of Cryptsy under applicable state and federal law, as well as by Cryptsy's governing charters, by-laws, articles and/or agreements.

6. The powers of the officers, directors, employees, and agents of Cryptsy are hereby suspended. Such persons and entities shall have no authority with respect to Cryptsy's operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operations of Cryptsy and shall pursue and preserve all of its claims.

7. No person holding or claiming any position of any sort with Cryptsy shall possess any authority to act by or on behalf of Cryptsy, unless so instructed by the Receiver.

8. The Receiver shall have the following general powers and duties:

A. Use reasonable efforts to determine the nature, location and value of all property interests of Cryptsy, including, but not limited to, cryptocurrencies, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which Cryptsy owns, possesses, has a beneficial interest in, or controls directly or indirectly;

B. Immediately take custody, control and possession of all of Cryptsy's property and records relevant thereto; to sue for and collect, recover, receive and take into possession from third parties all property of Cryptsy and records relevant thereto;

C. Manage, control, operate and maintain Cryptsy and hold in his possession, custody and control all property of Cryptsy, pending further Order of this Court;

D. Use property of Cryptsy, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver in maintaining the ordinary operations of Cryptsy;

E. Take any action which, prior to the entry of this Order, could have been taken by the officers, directors, employees, and agents of Cryptsy with respect to maintaining its ordinary operations;

F. Continue the normal operations of Cryptsy or alternatively to suspend, wind down or stop its operations;

G. Take such action as necessary and appropriate for the preservation of property of Cryptsy or to prevent the dissipation or concealment of property of Cryptsy;

H. Pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against Cryptsy;

I. Take immediate and exclusive custody, control and possession of all cryptocurrencies, monies, funds, property, and other assets in the possession of, or under the control of, Cryptsy, wherever situated that the Receiver has a reasonable basis to believe is related to this action. The Receiver shall have full power to sue for, collect, receive and take possession of all goods, chattels, rights, credits, moneys, effects, land, leases, books, records, work papers, and records of accounts, including computer-maintained information and digital data and other papers and documents. Title to all of the above items wherever located are vested by operation of law in the Receiver;

J. Enter and inspect the business premises of Cryptsy and to take documents or other property related to Cryptsy;

K. Preserve, hold and manage all receivership assets, and perform all acts necessary to preserve the value of those assets, in order to prevent any loss, damage or injury to investors or customers of Cryptsy;

L. Prevent the withdrawal or misapplication of funds entrusted to Cryptsy, and otherwise protect the interests of investors or customers of Cryptsy;

M. Collect all money owed to Cryptsy;

4

N. Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any lawsuits or arbitrations in state, federal or foreign jurisdictions necessary to preserve or increase the assets of Cryptsy and/or on behalf of Cryptsy and for the benefit of its investors and customers against: (1) those individuals and/or entities which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated, transferred or received any assets, properties, monies, proceeds or other items of value directly or indirectly traceable from Cryptsy, including Cryptsy and its officers, directors, employees, agents or any persons acting in concert or participation with them; or (2) any transfers of assets, properties, monies, proceeds or other items of value directly or indirectly traceable from Cryptsy investors or customers. Such actions may include, but not be limited to, seeking imposition of constructive trusts, seeking imposition of equitable liens, disgorgement of profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, *et. seq.* or otherwise, rescission and restitution, the collection of debts, and such Orders or other relief supported in law or equity from this Court as may be necessary to enforce this Order;

O. Request permission from this Court to extend the receivership over any person or entity who received transfers of assets, properties, monies, proceeds or other items of value derived from Cryptsy or its investors or customers and to give the Receiver possession of such;

P. Choose, engage, and employ attorneys, accountants and other reasonable agents or professionals, as the Receiver deems advisable or necessary in the performance of his duties and responsibilities. The Receiver and his professionals shall be entitled to reasonable compensation from the assets now held by Cryptsy or ultimately secured by the Receiver. Said compensation shall be commensurate with their duties and obligations under the circumstances, subject to approval of this Court;

Q. Issue subpoenas to obtain documents pertaining to the receivership and conduct discovery in this action on behalf of the receivership estate. The Receiver is authorized to take expedited discovery from parties and nonparties. Parties shall produce documents, answer interrogatories and/or answer requests for admissions within seven (7) calendar days of service of the Receiver's discovery requests. Parties shall sit for deposition within seven (7) calendar days of the Receiver's notice. The Receiver is authorized to serve subpoenas on nonparties through electronic means (including electronic mail and/or facsimile transmission), U.S. Mail, Federal Express, other commercial overnight service, or personal service to expedite the requested discovery. Documents from nonparties shall be produced to the Receiver within three (3) calendar days of service of the subpoena. Nonparties shall sit for deposition within five (5) calendar days of the Receiver's notice;

R. Open one or more bank account or any other type of account as designated depositories for funds of Cryptsy. The Receiver shall deposit all funds of Cryptsy in such designated accounts and shall make all payments and disbursements from the

receivership estate from such accounts. The Receiver is authorized to invest receivership funds in U.S. Treasury securities, money market funds or other interest-bearing accounts as appropriate in the Receiver's judgment;

S.  Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order;

T.  Close out all outstanding positions and/or hold such assets without further Order;

U.  Close, disable or otherwise shut down Cryptsy's current website and re-direct to, or create, a new website for purposes of the receivership;

V.  Advise this Court should it be determined that additional powers are necessary to protect the interests of Cryptsy or for the benefit of its investors and customers under the circumstances; and

W.  Take such other action as may be approved by this Court.

## IV. Access to Information

9.      Cryptsy and its past and/or present officers, directors, employees and agents, as well as those acting in its place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, Cryptsy and/or its property; such information shall include, but not be limited to, books, records, documents, accounts, electronically stored information, passcodes, and all other instruments and papers.

10.     Cryptsy's past and/or present officers, directors, employees and agents, and other appropriate persons or entities, shall answer under oath to the Receiver all questions which he may put to them and produce all documents as required by him regarding the business of Cryptsy, or any other matter relevant to the operation or administration of Cryptsy.

## V. Access to Books, Records and Accounts

11.     The Receiver is authorized to take immediate possession of any and all accounts, including financial accounts, books and records, electronically stored information, passcodes, and all other documents or instruments relating to Cryptsy.

12.     Any persons receiving notice of this Order by personal service, electronic mail, facsimile transmission, or otherwise, having possession of the property, business, books, records, accounts, electronically stored information, passcodes, or assets of Cryptsy are hereby directed to immediately deliver the same to the Receiver, his agents, his attorneys and/or his employees.

13.     All banks, cryptocurrency exchanges, clearing firms, financial institutions, and other persons or entities which have possession, custody or control of any assets, cryptocurrencies, monies, funds or accounts held by, in the name of, or for the benefit of, directly or indirectly, Cryptsy that receive actual notice of this Order by personal service, electronic mail, facsimile transmission or otherwise shall:

A.  Not liquidate, transfer, sell, convey or otherwise transfer any assets, cryptocurrencies, monies, funds, and/or accounts in the name of Cryptsy or for the benefit of its investors and customers, except upon instructions from the Receiver;

B.  Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any assets, cryptocurrencies, monies, funds, and/or accounts to the Receiver's control without the permission of this Court; and

C.  Cooperate expeditiously in providing information and assets, cryptocurrencies, monies, funds, and/or accounts to the Receiver or at the direction of the Receiver.

### VI. Access to Personal Property

14.     The Receiver is authorized to take immediate possession of all personal property of Cryptsy, wherever located, including, but not limited to, electronically stored information, passcodes, computers, laptops, hard drives, external storage drives, and any other such memory, media or electronic storage devices, books, papers, data processing records, evidence of indebtedness, bank records and accounts, cryptocurrency exchange records and accounts, clearing firm records and accounts, savings records and accounts, brokerage records and accounts, cryptocurrencies, certificates of deposit, stocks, bonds, debentures, investments,

contracts, mortgages, furniture, office supplies and equipment.  All records of Cryptsy shall be made available to the Receiver.

15.     The Receiver is authorized to open all mail -- including electronic mail -- directed to or received by or at the offices or post office boxes of Cryptsy, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

16.     The Receiver may seek the assistance of any Sheriff or the United States Marshal Service, in any judicial district, to assist the Receiver in carrying out his duties to take possession, custody and control of, or identify the location of, any assets, cryptocurrencies, monies, funds, accounts, records, electronically stored information, or other materials belonging to Cryptsy to the extent any Sheriff or the United States Marshal may be authorized to carry out such actions.  The Receiver shall pay any fees or charges required by any Sheriff or the United States Marshal to perform such actions.

## VII. Delivery to Receiver

17.     Immediately upon service of this Order upon them, Defendants and any other person or entity served with a copy of this Order shall, immediately or within such time as permitted by the Receiver in writing, deliver over to the Receiver:

A.      Possession and custody of all assets, cryptocurrencies, monies, funds and/or accounts belonging to Cryptsy, its investors, or its customers;

B.      Possession and custody of documents of Cryptsy, including, but not limited to, all books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), investor lists, loan documents, title documents, electronically stored information, and other papers;

C.      All keys, computer passwords, entry codes, PIN numbers and combinations to locks necessary to gain or to secure access to any of the assets, cryptocurrencies, monies, funds, accounts and/or documents of Cryptsy, including, but not limited

to, access to business premises, means of communication, accounts, computer systems, websites, or other property; and

D.    Information identifying the accounts, employees, properties or other assets or obligations of Cryptsy.

## VIII.    Cooperation with Receiver

18.    Defendants, their officers, directors, employees and agents, and all other persons or entities served with a copy of this Order, shall cooperate fully with and assist the Receiver in the performance of the Receiver's duties.  This cooperation and assistance shall include, but not be limited to, providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this Order; and advising all persons who owe money to Cryptsy that all debts should be paid directly to the Receiver.  However, this requirement does not impinge on any person's right to assert applicable privileges.

19.    Any officers or directors of Cryptsy will be available to assist and advise the Receiver, but will not exercise their traditional functions or assume their traditional duties during the period that the Receiver is appointed.

## IX. Accounting

20.    Defendants who have access to the appropriate documents and records shall prepare, sign and submit to the Receiver, within thirty (30) calendar days, a complete and accurate accounting for the period of January 1, 2013 to the date of such accounting, which shall be no earlier than the date of this Order.  Such accounting shall include, without limitation, the identification of:

A.    All banks, financial and cryptocurrency institutions, including account numbers and passcodes/login information, which hold or have held cryptocurrencies, monies, funds, commodity interests, assets, liabilities, and other property

currently and previously owned or controlled (legally, equitably or otherwise) directly or indirectly by Cryptsy, whether individually or jointly;

B.      All cryptocurrencies, monies, funds, commodity interests, real estate, assets, liabilities, and other property currently or previously owned or controlled (legally, equitably or otherwise) directly or indirectly by Cryptsy, whether individually or jointly;

C.      All cryptocurrencies, monies, funds, commodity interests, real estate, assets, liabilities, and other property received directly or indirectly by Cryptsy, describing the source, amount, disposition, and current location of each listed item;

D.      All cryptocurrencies, monies, funds, commodity interests, real estate, assets, liabilities, and other property transferred or otherwise disposed of directly or indirectly by Cryptsy, describing the source, amount, disposition, and current location of each listed item, including accounts or assets of Cryptsy held by any bank, cryptocurrency exchange, clearing firm, brokerage firm or other financial institution located inside and/or outside the territorial United States;

E.      All investors and customers of Cryptsy, including name, address, telephone number and email, account number, deposit and withdrawal dates and amounts; and

F.      The name and last known address of each bailee, debtor or other person or entity currently holding any cryptocurrencies, monies, funds, commodity interests, real estate, assets, liabilities, and other property owned or controlled (legally, equitably or otherwise) by Cryptsy, whether individually or jointly.

21.      At a minimum, the accounting should also include a chronological schedule of all cash receipts and cash disbursements.  In addition, each transaction shall be classified as business or personal. All business transactions shall disclose the business purpose of the transaction. The accounting shall be provided in an electronic format such as Quicken, Excel, or other accounting or electronic format spreadsheet. In addition, Defendants shall supply true and accurate copies of any balance sheets, income statements, statements of cash flow, or statements of ownership equity previously prepared for Cryptsy's business(es).

## X. Notice to Third Parties

22.     The Receiver shall promptly give notice of his appointment as he deems necessary or advisable to effectuate the operation of his appointment.

23.     All persons and entities owing any obligation or debt to Cryptsy shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and his receipt for such payments shall have the same force and effect as if Cryptsy had received such payment.

24.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of Cryptsy (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, Cryptsy. The Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail.  Cryptsy shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver.   All personal mail of any individual, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver.  The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mail box, depository, business or service, or mail courier or delivery service, hired, rented or used by Cryptsy.   Cryptsy shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. Mail, a private mail depository or courier service.

25.     The Receiver is authorized to instruct Cryptsy's website hosting company and ISP to hold and/or reroute any and all electronic mail which is related, directly or indirectly, to the

11

business, operations or activities of Cryptsy (the "Receiver's Electronic Mail"), including all electronic mail addressed to, or for the benefit of, Cryptsy or any of Cryptsy's officers, directors, managers, agents or employees in their capacity as such for Cryptsy. The website hosting company and ISP shall not comply with, and shall immediately report to the Receiver, any change of Internet or e-mail address or other instruction given by anyone other than the Receiver concerning the Receiver's Electronic Mail. Cryptsy shall not open any of the Receiver's Electronic Mail and shall immediately turn over such electronic mail, regardless of when received, to the Receiver. All personal electronic mail of any individual, and/or any electronic mail appearing to contain privileged information, and/or any electronic mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver. The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private electronic mail box, depository, business or service, or electronic mail service provider hired or used by Cryptsy. Cryptsy shall not open a new electronic mailbox, or take any steps or make any arrangements to receive electronic mail in contravention of this Order.

26. The Receiver is authorized to assert, prosecute and/or negotiate any claim under any insurance policy held by or issued on behalf of Cryptsy, its officers, directors, employees or agents, and to take any and all appropriate steps in connection with such policies.

## XI. Injunction against Interference

27. Cryptsy and all persons receiving notice of this Order by personal service, electronic mail, facsimile transmission or otherwise, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, which would:

   A. Interfere with the Receiver's efforts to take control, possession, or management of any of Cryptsy's property; such prohibited actions include, but are not limited to,

12

using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any of Cryptsy's property;

B. Hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include, but are not limited to, concealing, destroying or altering records or information;

C. Dissipate or otherwise diminish the value of any of Cryptsy's property; such prohibited actions include, but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any of Cryptsy's property, enforcing judgments, assessments or claims against Cryptsy or its property, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by Cryptsy or which otherwise affects any of its property;

D. Dissipate, withdraw, transfer, remove, dispose or conceal any cash, cashier's checks, funds, assets or other property of, or within the custody, control or actual or constructive possession of Cryptsy, including, but not limited to, all funds, personal property, monies, funds, cryptocurrencies, or securities held in Cryptsy's name, jointly or individually, whether held or maintained in safety deposit boxes, and including all funds on deposit in any bank, cryptocurrency exchange, clearing firm, brokerage firm or other financial institution, futures commission merchant, bank or savings and loan account held by, under the actual or constructive control, or in the name of Cryptsy, jointly or individually, funds or property of Cryptsy's investors or customers, wherever located, whether held in the name of the Cryptsy, jointly or individually, or any other entity owned or controlled by Cryptsy, jointly or individually;

E. Destroy, mutilate, conceal, alter or dispose of, in any manner, any of the books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Cryptsy wherever located, including all such records concerning Cryptsy's business operations; or

F. Interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over Cryptsy.

28. Cryptsy, its officers, directors, employees and agents, and all other persons or entities served with a copy of this Order, shall cooperate with and assist the Receiver in the performance of his duties.

29.     The Receiver shall promptly notify this Court of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

30.     The injunctive provisions of this Order shall be binding on Defendants, upon any person insofar as he or she is acting in the capacity of officers, directors, employees and agents, and upon any person who receives actual notice of this Order by personal service, electronic mail, facsimile transmission or otherwise, including Federal Express or other commercial overnight service.

## XII.     Directives to Financial Institutions

31.     Pending further Order of this Court, any bank, cryptocurrency exchange, clearing firm, brokerage firm or other financial institution, business entity, or person that holds, controls, or maintains custody of any cryptocurrencies, monies, funds, accounts, commodity interests, real estate, assets, liabilities, electronically stored information, and other property of any kind owned, controlled, managed, or held by, on behalf of, or for the benefit of Cryptsy, its investors or customers, or has held, controlled, or maintained custody of any cryptocurrencies, monies, funds, accounts, commodity interests, real estate, assets, liabilities, and other property of any kind owned, controlled, managed, or held by, on behalf of, or for the benefit of Cryptsy, its investors or customers at any time since, shall:

A.     Provide immediate access to the Receiver of: (a) the identification number of each and every such account or asset titled in the name, individually or jointly, of Cryptsy, or owned, controlled, managed, or held by, on behalf of, or for the benefit of Cryptsy, its investors or customers; (b) the balance of each such account, or a description of the nature and value of such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and (c) the identification of any safe deposit box that is either titled in the name, individually or jointly, of Cryptsy or is otherwise subject to access by Cryptsy; and

14

B.     Copies of all records or other documentation pertaining to such account or asset, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instructions or slips, currency transactions reports, 1099 forms, and safe deposit box logs;

C.     Prohibit Defendants and any person other than the Receiver from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling or otherwise disposing of any such asset except as directed by further Order of this Court;

D.     Deny Defendants and any person other than the Receiver access to any safe deposit box that is titled in the name of Cryptsy, either individually or jointly; or otherwise subject to access by the Defendants; and

E.     Cooperate with all reasonable requests of the Receiver relating to implementation of this Order, including producing records related to Cryptsy's accounts and business(es).

## XIII. Managing Assets

32.     The Receiver may establish one or more custodial accounts at a federally insured bank to receive and hold all funds of Cryptsy. Such deposit accounts shall be titled in the Receiver's name.

## XIV. Conflicts of Interest

33.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between himself and Cryptsy.

## XV. Limitations on Liability of Receiver and His Agents

34.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

35.     The Receiver and all persons hired by Receiver are entitled to rely on all outstanding rules of law and Orders, and shall not be liable to anyone for their own good faith compliance with any Order, rule, law, judgment or decree. In no event shall the Receiver or

15

persons hired by Receiver be liable to anyone (1) with respect to the performance of their duties and responsibilities as Receiver or persons hired by Receiver, or (2) for any actions taken or omitted by them, except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties. Nothing in this provision is intended to provide a defense against liability for any actions taken by Defendants or their personnel prior to the appointment of the Receiver.

36.     This Court shall retain jurisdiction over any action filed against the Receiver or his agents based upon acts or omissions committed in their representative capacities.

37.     In the event the Receiver decides to resign, he shall first give written notice to Plaintiffs' counsel of record and this Court of his intention, and the resignation shall not be effective until this Court appoints a successor Receiver. The Receiver shall then follow such instructions as this Court may provide.

## XVI. Recommendations and Reports

38.     Upon his appointment, the Receiver shall perform an assessment of the viability of Cryptsy as a going business enterprise and options and alternatives for its future.

39.     Within thirty (30) calendar days of the entry date of this Order, the Receiver shall file with this Court and serve on the parties a report of his conclusions and recommendations.

40.     The Receiver shall maintain written accounts, itemizing receipts and expenditures, describing properties held or managed, and naming the depositories of receivership funds; make such written accounts and supporting documentation available to Plaintiffs and other Cryptsy investors and customers for inspection, and, within ninety (90) calendar days of his first report and every ninety (90) calendar days thereafter file with this Court and serve on the

parties a report summarizing efforts to marshal and collect assets, administer the receivership estate, and otherwise perform the duties mandated by this Order.

## XVII. Fees, Expenses, and Accountings

41.    The Receiver need not obtain Court approval prior to the disbursement of Cryptsy's funds for expenses in the ordinary course of the administration and management of Cryptsy.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

42.    The Receiver and all professionals he retains are entitled to compensation deemed to be reasonable and appropriate for their work.  The Receiver's standard hourly rate is currently $400-$500, and the Receiver is approved for an hourly rate of $400 in this matter.  The Receiver is authorized to file motions to employ professionals, such as attorneys and/or accountants, whose rates will be disclosed in same.

43.    The Receiver and his professionals, such as attorneys and/or accountants, shall file a periodic fee application for payment of reasonable fees and reimbursement of actual incurred costs.  The fee/cost applications shall be filed at a time that the Receiver deems appropriate in his discretion.  The Receiver and his professionals shall include in the fee/cost applications their statements for services for the relevant months of work and shall serve same on counsel for parties in this action.  Both the Receiver's and his professionals' statements shall contain itemized time entries with the daily hours spent on receivership matters.

44.    The compensation of the Receiver and his professionals shall be entitled to priority as administrative expenses.  The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of this Court.

### XIII.   Service of This Order

45.    Copies of this Order may be served by any means, including by way of personal service, Federal Express or other commercial overnight service, electronic mail or facsimile transmission, upon any financial institution or any other entity or any other person that may have possession, custody, or control of any documents or assets of Cryptsy or that may be subject to any provision of this Order.  The Receiver and his agents are hereby specially appointed to serve process, and/or effectuate service of process, including this Order and all other papers in this cause.

### XIX. Preservation of Rights and Privileges

46.    Nothing in this Order shall be construed to require that any Defendants abandon or waive any constitutional or legal privilege which they may have available to them.

### XX.    No Bond

47.    The Receiver is appointed without bond.

### XXI.   Court Maintains Jurisdiction

48.    This Order shall remain in full force and effect during the pendency of this case, or until further Order of this Court, upon application, notice and an opportunity to be heard, and that this Court retains jurisdiction of this matter for all purposes related to this action.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 4th day of March, 2016.

KENNETH A. MARRA
United States District Judge

Case No. 9:16-cv-80060-MARRA

Copies to:
    Counsel and parties of record