**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Action No. 9:16-cv-81992-MARRA**

BRANDON LEIDEL, individually,
and on behalf of all others similarly situated,

      Plaintiff,

v.

COINBASE, INC., a Delaware corporation
d/b/a, Global Digital Asset Exchange (GDAX),

      Defendant.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: (954) 516-6000
DAVID C. SILVER
E-mail: DSilver@SilverMillerLaw.com
JASON S. MILLER
E-mail: JMiller@SilverMillerLaw.com

**WITES LAW FIRM**
4400 N. Federal Highway
Lighthouse Point, FL 33064
Telephone: (954) 993-4400
Facsimile: (954) 354-0205
MARC A. WITES
E-mail: MWites@witeslaw.com

*Counsel for Plaintiff and the Class*

- 1 -

I.    **INTRODUCTION**

This nationwide class action is brought on behalf of a class of similarly situated users of Project Investors, Inc. d/b/a CRYPTSY ("CRYPTSY"), a cryptocurrency exchange and Money Services Business based in South Florida that served clients in the United States and abroad (the "Class"). The case is related to another class action before this Court styled *Leidel, et al. v. Project Investors, Inc. d/b/a Cryptsy, Paul Vernon, and Lorie Ann Nettles*, Case No. 9:16-cv-80060-MARRA (the "CRYPTSY CASE"). This class action asserts claims on behalf of the same Class against Defendant COINBASE, a California headquartered cryptocurrency exchange, through which CRYPTSY's founder, Paul Vernon ("Vernon"), converted into U.S. Dollars the cryptocurrency he stole from the Class and then transferred the stolen funds to his personal bank accounts before absconding to China.

Plaintiff asserted four claims against Coinbase based on its conduct in connection with Vernon and CRYPTSY's theft of the Class's assets: (i) Aiding and Abetting Breach of Fiduciary Duty; (ii) Aiding and Abetting Conversion; (iii) Negligence; and (iv) Unjust Enrichment. The first two counts are based on Coinbase's actual knowledge of and substantial assistance with CRYPTSY and Vernon's tortious conduct resulting in the theft of Plaintiff's assets. Count III is based on Coinbase's direct negligent conduct which caused Plaintiff's damages. Count IV is based on the equitable claim that Coinbase received a direct benefit from Plaintiff by virtue of its receipt of fees taken from the Class' assets to pay for its services provided to Vernon and CRYPTSY that allowed them to steal Plaintiff's assets.

Defendant's Motion for Summary Judgment must be denied because it is a based on a narrow and incomplete consideration of the record evidence and an erroneous application of the law. The result is a misleading, one-sided argument that portrays Defendant as an ignorant and innocent tool of a devious crook while ignoring obvious disputed issues of material fact that prove otherwise. As to purely legal issues, Defendant's motion seeks to cloak itself under the protection of legal precedent that applies uniquely to banks. Notably missing from Defendant's motion, however, is any fact or argument that COINBASE is a bank. Nor could Defendant make such an argument for the simple reason that **COINBASE is not a bank**. If COINBASE were to argue that it is, in fact and law, a bank, it would expose COINBASE to myriad federal and state regulations to which it does not want to be bound. However, it is the very protections imposed on banks by these regulations that gives rise to the lenient legal standards on which Defendant relies

to evade liability in this case. COINBASE wants the benefits of being treated like bank without actually being a bank. The Court should see through this ruse for what it is, an attempt to avoid responsibility for its conduct. Defendant cannot simply ignore the record evidence and applicable legal theories to sweep the disputed issues of material fact under the rug. This case must be tried to a jury to determine Defendant's culpability for the theft of Plaintiff's assets.

## II.    **BACKGROUND**[1]

Before addressing the specific facts of COINBASE's conduct vis-à-vis the theft of the Plaintiff class's assets, it is important to understand the nature of cryptocurrency and the exchanges, like COINBASE, that allow people and businesses, like CRYPTSY and Vernon, to buy, sell, trade and convert virtual currency in this unique and highly risky market. In 2013, the U.S. Treasury Department Financial Crimes Enforcement Network ("FinCEN") issued a regulatory guidance letter addressing cryptocurrency exchanges. Dept. of the Treas. Fin. Crimes Enforcement Network, OPINION LETTER ON APPLICATION OF FINCEN'S REGULATIONS TO PERSONS ADMINISTERING, EXCHANGING, OR USING VIRTUAL CURRENCIES (Fin-2013-G001 March 18, 2013) (the "Guidance"). In that Guidance, FinCEN confirmed that virtual currency exchange businesses had been subject to Bank Secrecy Act ("BSA") and Anti-Money Laundering regulations since 2011. *Id.* at p.2. Specifically, the Guidance stated that a virtual currency exchange service that is engaged as "a business in the exchange of virtual currency for real currency, or other virtual currency" and that "(1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason is a money transmitter" and therefore subject to the BSA as a Money Services Business ("MSB"). *Id.* A Money Services Business (defined in 31 CFR 1010.100(ff)) is a materially different thing from a bank, which is defined in 31 CFR 1010.100(d). In fact, the Code of Federal Regulations (31 CFR 1010.100(ff)(8)(*i*)) specifically notes that the term "Money Services Business" shall ***not*** include a bank.

FinCEN described the regulations to which virtual currency exchanges are subject as: (i) registering with FinCEN as an MSB; (ii) preparing a written AML (anti-money laundering) compliance program that is designed to mitigate risks (including money laundering risks)

---

[1]    The facts supporting Plaintiff's Memorandum are set forth in Plaintiff's Opposition to Defendant's Statement of Undisputed Material Facts, which is being filed contemporaneously herewith.

associated with the entity's specific business and customer mix, and to ensure compliance with other BSA requirements; (iii) filing BSA reports, including suspicious activity and currency transaction reports; (iv) keeping records for certain types of transactions at specific thresholds; and (v) obtaining customer identification information sufficient to comply with the AML Program and recordkeeping requirements. U.S. Dept. of Treasury, Office of Legislative Affairs, OPINION LETTER TO UNITED STATES SENATE COMMITTEE ON FINANCE (Feb. 13, 2018). FinCEN also clarified that although virtual currency exchange businesses are subject to the BSA and AML regulations, virtual currency is NOT real currency. As stated by FinCEN:

> In contrast to real currency, "virtual" currency is a medium of exchange that operates like a currency in some environments but does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction.

Fin-2013-G001 at p.1.

The importance of this distinction between "real currency" and "virtual currency" -- and between virtual currency exchange businesses and real banks -- was further highlighted by the Securities and Exchange Commission in an Investor Alert issued on May 7, 2014.  U.S. Securities and Exchange Commission, INVESTOR ALERT: BITCOIN AND OTHER VIRTUAL CURRENCY-RELATED INVESTMENTS (May 7, 2014). In that alert, the SEC warned that "***Bitcoin operates without*** central authority or ***banks*** and is not backed by any government." *Id.* (emphasis added). The SEC further warned that ***bitcoin exchanges*** "that play an important role in the use of bitcoins ***may be unregulated or operating unlawfully***." *Id.* (emphasis added). Moreover, unlike securities accounts at U.S. brokerage firms and bank accounts at U.S. banks, bitcoin held in digital wallets or bitcoin exchanges are not insured by the Securities Investor Protection Corporation or the Federal Deposit Insurance Corporation. *Id.* Of particular importance to this case, the SEC warned, "Bitcoin exchanges may stop operating or permanently shut down due to fraud, technical glitches, hackers or malware. Bitcoin may also be stolen by hackers." *Id.* Put simply, the SEC warned, "as a recent invention, Bitcoin does not have an established track record of credibility and trust." *Id.*

In one of the most sweeping investigations of virtual currency exchange businesses, the New York State Attorney General's Office reported:

> [U]nlike those traditional players, virtual asset trading platforms now in operation have not registered under state or federal securities or commodities laws. Nor

have they implemented common standards for security, internal controls, market surveillance protocols, disclosures, or other investor and consumer protections.

Accordingly, customers of virtual asset trading platforms face significant risks. In recent years, hackers have infiltrated trading platforms and stolen billions of dollars' worth of virtual currency, leaving customers with little or no recourse. Delays and outages on trading platforms are common, leaving customers unable to withdraw funds and susceptible to significant losses given volatile prices. Public reports also have linked certain trading platforms to deceptive and predatory practices, market manipulation, and insider abuses.

Office of the New York State Attorney General, VIRTUAL MARKETS INTEGRITY INITIATIVE REPORT 1 (Sept. 18, 2018).[2]

The primary questions in dispute between the parties are whether COINBASE knew that CRYPTSY and Vernon were using their services to commit the theft, whether COINBASE provided substantial assistance to CRYPTSY and Vernon, and whether COINBASE owed the Class members a duty to protect them from the risks inherent in the services they provided. As explained below, the record evidence clearly establishes a basis from which a reasonable jury could conclude that COINBASE did have actual knowledge, provided substantial assistance, and breached a duty resulting in the theft of the Plaintiff class' virtual currency assets.

## III.    LEGAL ARGUMENT

Plaintiff acknowledges that the facts of this case are contested. Witnesses have said contradictory things. The documents can be read to support different conclusions, and the expert reports reach very different conclusions. Defendant, however, simply ignores these disputed issues in favor its own self-serving statements of ignorance. As explained below, Defendant's attempt to whitewash the facts is inappropriate for a summary judgment motion. Defendant's motion should therefore be denied.

### A.  Aiding and Abetting Breach of Fiduciary Duty and Conversion.

Aiding and abetting breach of fiduciary duty and conversion are based on the same fundamental elements: the commission of the underlying tort by one party where another party

---

[2] Other financial regulators have issued similar warnings. The Financial Industry Regulatory Authority ("FINRA") issued an Investor Alert in which it warned, "There is also the risk of fraud related to companies claiming to offer Bitcoin payment platforms and other Bitcoin-related products and services." http://www.finra.org/investors/alerts/bitcoin-more-bit-risky. The North American Securities Administrators Association warned that Digital Currency was one of its top emerging investor threats in 2013. https://www.nasaa.org/27012/nasaa-expands-annual-top-investor-threats-list/?qoid=newsroom.

has actual knowledge of the commission of that tort and provides substantial assistance to the party that committed the underlying tort. *Casey v. U.S. Bank Nat. Ass'n*, 127 Cal.App.4th 1138, 1144 (Cal. Ct. App. 2005); *Chang v. JP Morgan Chase, N.A.,* 845 F.3d 1087 (11th Cir. 2017); *Lesti v. Wells Fargo Bank, N.A.*, 960 F.Supp.2d 1311, 1321 (M.D. Fla. 2013); *Simi Management Corp. v. Bank of America, N.A.*, 930 F.Supp.2d 1082, 1098 (N.D. Cal. 2013); *Jordan v. Paul Financial, LLC*, 285 F.R.D. 435, 452 (N.D. Cal. 2012); *Neilsen v. Union Bank of California, N.A.,* 290 F.Supp.2d 1101, 1133 (C.D. Cal. 2003). Moreover, a defendant can be liable for aiding and abetting even if the defendant owes no independent duty to the plaintiff. Simply having knowledge of the underlying tort committed by someone else and providing substantial assistance in the commission of that tort is sufficient. *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal.App.4th 1451, 1476 (Cal. Ct. App. 2014); *Neilsen*, 290 F.Supp.2d at 1135; *Simi Mgmt. Corp.*, 930 F.Supp.2d at 1099.

## 1. Aiding and Abetting Conversion

As to Count I for aiding and abetting conversion, Defendant's motion asserts that COINBASE had no actual knowledge of the conversion and that it did not substantially assist with the conversion. Defendant's argument misses the mark. Evidence sufficient to prove actual knowledge need not be direct; it rarely is. Rather, circumstantial evidence from which a reasonable inference of actual knowledge can be drawn is sufficient to preclude summary judgment. *Freeman v. JPMorgan Chase Bank, N.A.*, 675 Fed.Appx. 926, 933 (11th Cir. 2017); *Overton v. Art Fin. Partners LLC,* 166 F.Supp.3d 388, 411 (S.D.N.Y. 2016); *Cobalt Multifamily Investors I, LLC v. Shapiro*, 9 F.Supp.3d 399, 413 (S.D.N.Y. 2014); *Simi Mgmt. Corp.*, 930 F.Supp.2d at 1100; *Smith v. First union Nat'l Bank*, 2002 WL 31056104 *2, Case No. 00-4485 (S.D. Fla. Aug. 23, 2002); *Lawyers Title Ins. Corp. v. United American bank of Memphis*, 21 F.Supp.2d 785, 798-800 (W.D. Tenn. 1998).

COINBASE knew that Vernon and CRYPTSY used COINBASE's virtual currency exchange services to engage in an extraordinarily and unusually large volume of transactions to convert virtual currency to fiat currency as compared to every other customer. COINBASE knew that the source of CRYPTSY's virtual currency was either from CRYPTSY's customers or from Vernon's personal mining of bitcoin. COINBASE knew that the extremely large volume of Vernon and CRYPTSY's transactions were highly unusual and could not possibly have been generated solely from his personal mining efforts or from commissions on transactions by

CRYPTSY's customers. COINBASE knew that CRYPTSY operated from a jurisdiction known for protecting fraudsters. COINBASE treated CRYPTSY and Vernon's transactions differently from other customers who engaged in high volume (although lower than CRYPTSY and Vernon's) transactions by allowing them to continue its transactions when it suspended other customer's transactions based on lower trading volumes. COINBASE failed to conduct basic due diligence on CRYPTSY and Vernon's transactions contrary to its own standards of due diligence and AML and BSA regulatory requirements. COINBASE reaped huge revenues from CRYPTSY and Vernon's transactions.

When independent reports surfaced that CRYPTSY and Vernon were being investigated for fraud and money laundering, COINBASE quietly closed CRYPTSY's and Vernon's COINBASE accounts and concealed their relationship from federal regulators by failing to report CRYPTSY and Vernon's transactions using the COINBASE platform. It then continued provide Vernon with information about his accounts after he fled to China and his theft was complete. All the while, COINBASE knew that it operated in an industry that was rife with fraud, theft, and the potential for money laundering -- and it did so without a set of policies and procedures (flawed and incomplete as they were) that would have easily identified CRYPTSY and Vernon's theft and confirmed that the virtual currency exchanged belonged to the Plaintiff class. COINBASE also knew that Vernon and CRYPTSY needed COINBASE's services as a virtual currency exchange service that allowed conversion of virtual currency into fiat currency to complete their theft, and COINBASE knew it reaped huge revenue from allowing CRYPTSY and Vernon to use its service with little to no oversight.

These facts, taken together, give rise to a clear inference that COINBASE had actual knowledge that CRYPTSY and Vernon were engaged in theft of their clients' funds through COINBASE's cryptocurrency exchange platform. If COINBASE didn't know CRYPTSY was stealing its customers' assets, why avoid any investigation of its transactions to verify the history of the blockchain of the bitcoin it transferred to COINBASE? Why didn't anyone call Vernon directly to question the transactions? Why didn't COINBASE place a hold on CRYPTSY and Vernon's transactions like COINBASE had done for other smaller volume customers? Why didn't COINBASE report CRYPTSY's transactions and communications to any governmental authority despite its clear regulatory obligation to do so? At the same, time, COINBASE voraciously protected its relationship with CRYPTSY and Vernon by pressing its partner bank to

keep them as customers due to the large volume of fees they generated, and they did so just months before reports of CRYPTSY's theft and fraud were publicly reported.

Accordingly, there is extensive evidence that Defendant had knowledge of facts from which an inference of actual knowledge and substantial assistance can be drawn. Moreover, all such inferences must be drawn in favor of the non-moving party on a motion for summary judgment. Because there is a disputed issue of material fact and the inferences to be drawn from the facts as to whether Defendant had actual knowledge of CRYPTSY's conversion and whether Defendant provided substantial assistance to CRYPTSY and Vernon, Defendant's motion as to Count I of Plaintiff's Class Action Complaint must be denied.

Defendant's reliance on cases involving aiding and abetting claims against banks are inapposite. *See, e.g. Lawrence v. Bank of America, N.A.*, 455 Fed.Appx. 904, 907 (11th Cir. 2012); *Wiand v. Wells Fargo Bank, N.A.*, 938 F.Supp.2d 1248 (M.D. Fla. 2013). As stated in *Lawrence*, that Court's dismissal of the aiding and abetting claim in that case was explicitly premised on the fact that "Florida law does not require banking institutions to investigate transactions." *455 Fed.Appx.* at 907. As noted, COINBASE was and is not a bank. It had none of the extensive statutory, regulatory, and legal protections afforded to banks that allow them to operate under lesser scrutiny in order to ensure seamless and efficient banking transactions. Moreover, even if bank-specific authorities were applicable, they do not absolve COINBASE. As stated by the California court in *Casey*, "common sense tells us that even 'ordinary business transactions' a bank performs for a customer can satisfy the substantial assistance element of aiding and abetting if the bank actually knew those transactions were assisting the customer in committing a specific tort." *Casey*, 127 Cal.App.4th at 1145.

COINBASE knowingly operated in an industry and provided services that numerous federal agencies warned were rife with the risk of fraud, theft and money laundering, precisely because they are not banks. At the time of the theft, COINBASE operated with almost no compliance procedures and almost no due diligence oversight of its customers' conduct, including that of CRYPTSY and Vernon. Applying to COINBASE the legal standard governing a bank's actual knowledge of its customer's tortious conduct would grant unwarranted preference to a business that, at the time of the theft, was the antithesis of a state or federally

regulated banking institution that had none of the features of a bank that justify their special treatment.[3] Such an argument is simply preposterous.

## 2. Aiding and Abetting Breach of Fiduciary Duty

As to Count II for aiding and abetting breach of fiduciary duty, Defendant argues, in addition to the purported absence of evidence of its actual knowledge of, or provision of substantial assistance to the breach of fiduciary duty, that no fiduciary duty existed between CRYPTSY and Plaintiff. These arguments are simply wrong.

First, as to the absence of evidence of actual knowledge and substantial assistance, the same facts that preclude summary judgment as to aiding and abetting conversion also preclude summary judgment as to aiding and abetting breach of fiduciary duty.

Second, as to the existence of a duty, Defendant again improperly relies on a false analogy between CRYPTSY's relationship with its customers and the relationship between a bank and its depositors. CRYPTSY was not a bank. Plaintiff and the class were not simply depositors; and bitcoin is not fiat money. Thus, the case law on which Defendant relies is entirely inapposite.

Instead, this Court must look to generally applicable law to determine if a fiduciary duty arose between Plaintiff and CRYPTSY. A fiduciary relationship is defined as:

> The relation and duties involved need not be legal; they may be moral, social, domestic or personal. *If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.* The origin of the confidence is immaterial.

*Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (emphasis in original). "A fiduciary relationship may be implied by law, and such relationships are 'premised upon the specific factual situation

---

[3] Defendant's remaining cases are equally inapposite because they arose in the context of a motion to dismiss where the plaintiffs made only "conclusory statements that a defendant actually knew" of the alleged underlying tort and, in most cases arose from claims against banks. *See  Ackner v. PNC Bank Nat'l* Ass'n, Case No. 16-81648, 2017 WL 7726684 *4 (S.D. Fla. Aug. 30, 2017) (Marra, J.) (granting motion to dismiss claim against bank); *In re Brican America LLC*, Case No. 10-md-02183, 2015 WL 11661980 (S.D. Fla. Aug. 4, 2015) (motion to dismiss); *Honig v. Kornfeld*, 339 F.Supp.3d 1323 (S.D. Fla. 2018) (motion to dismiss); *Lamm v. State Street Bank & Trust Co.*, 889 F.Supp.2d 1321 (S.D. Fla. 2012) (motion to dismiss claim against bank). Here, there is extensive record evidence from which a jury could reasonably conclude that COINBASE had actual knowledge of the underlying misconduct and the claim is not against a bank. *See Simi Management Corp.,* 930 F.Supp.2d at 1098 (denying summary judgment against aiding and abetting claim where circumstantial evidence established a basis for jury to reasonably infer actual knowledge).

surrounding the transaction and the relationship of the parties.'" *Id.* (quoting *Capital Bank v. MVB, Inc.* 644 So.2d 515, 518 (Fla. 3rd DCA 1994).[4] Applying this standard, fiduciary duties implied in law are recognized when "confidence is reposed by one party and a trust accepted by the other." *Capital Bank*, 644 So.2d at 518.[5] Moreover, "it is not essential that the undertaking be related to advice-giving, but an essential aspect is that there be a level of 'trust and confidence' inherent in the relationship." *Combe v. Flocar Inv. Group Corp.*, 977 F.Supp.2d 1301, 1307 (S.D. Fla. 2013).

Here, Plaintiff placed his trust and confidence in CRYPTSY to provide him with a secure computerized platform in which to store his valuable virtual currency assets, and he placed those assets under CRYPTSY's complete control subject only to Plaintiff's instructions as to how to sell, trade, exchange or otherwise engage in transactions using his virtual currency. Moreover, the complex technical requirements necessary to provide a secure virtual currency wallet and exchange placed CRYPTSY at a uniquely superior advantage over its customers.  Plaintiff and those similarly-situated victims on whose behalf he has brought this lawsuit placed their trust and confidence in CRYPTSY's professed expertise in creating and maintaining a secure and private virtual currency exchange and wallet platform and promise that it would protect the assets placed under its control, at the very least from CRYPTSY's own misconduct. Based on these facts, an implied fiduciary duty clearly existed between CRYPTSY and the Plaintiff class members. *Id.; see also Bankest Imports, Inc. v. Isca Corp.*, 717 F.Supp. 1537, 1541 (S.D. Fla. 1989) ("To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party.").

Further, as noted above, bitcoin is not fiat currency. Each bitcoin is a unique virtual asset that is traceable to its owner through the blockchain and other information. While bitcoin can be readily traded, exchanged, or transferred, each bitcoin is a unique asset based on a unique computer code traceable to its location on the blockchain. Thus, a virtual wallet holding bitcoin, unlike a bank account holding fungible fiat currency, is more akin to an escrow account as it

---

[4] Plaintiff relies on Florida law to determine the existence of a fiduciary duty between CRYPTSY and its customers because any such duty would have only arisen in Florida where CRYPTSY and Vernon resided and from which they offered their services to their customers.

[5] As this case and others make clear, even banks can be held to owe fiduciary duties to their customers, although the Court need not apply this heightened standard as applied to banks here since CRYPTSY is not a bank and does not claim to be a bank. *Capital Bank*, 644 So.2d at 518 (and cases cited therein).

contains unique assets owned by the named beneficiary/holder of the wallet. CRYPTSY is therefore properly viewed as an escrow agent, rather than a bank. The law is well settled in Florida that escrow agents owe a fiduciary duty to the other parties to the escrow transaction and are considered trustees in charge of the performance of an express trust. *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1064-65 (Fla. 3rd DCA 1993). That is precisely the nature of the relationship between Plaintiff and CRYPTSY. Moreover, a fiduciary who steals the assets of the beneficiary who placed their trust and confidence in the fiduciary plainly breaches the fiduciary duty. *Combe v. Flocar Inv. Group Corp.*, 977 F.Supp.2d at 1307; *Columbia Bank v. Turbeville*, 143 So.3d 964, 969-970 (Fla. 1st DCA 2014).

### 3. If COINBASE Were a Bank, It Would Still Be Liable for Aiding and Abetting

Even if the Court were to treat COINBASE as a bank (which it most definitely is not), COINBASE may be liable for aiding and abetting CRYPTSY's tortious conduct. As noted in *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 232 (5th Cir. 2010):

> . . . a bank may be held liable for its customer's misappropriation where[:] (1) there is a fiduciary relationship between the customer and the non-customer, (2) the bank knows or ought to know of the fiduciary relationship, and (3) the bank has "actual knowledge or notice that a diversion is to occur or is ongoing."

595 F.3d at 232; *See also, Chang*, 845 F.3d at 1095; *Simi Mgmt. Corp. v. Bank of Am. Corp.*, Case No. C-11-5573, 2012 WL 1997232 *6 (N.D. Cal. June 4, 2010). Under these circumstances, even a true banking institution can be held responsible for aiding and abetting misappropriation of assets belonging to a non-customer. *Lorenz v. East West Bancorp, Inc.*, Case NO. 15-cv-06336, 2016 WL 199392 *8-9 (C.D. Cal. Jan. 14, 2016); *Gonzalez v. Lloyds TSB Bank, PLC*, 532 F.Supp.2d 1200, 1207 (C.D. Cal. 2006). In the instant matter, that means that facts sufficient to give rise to a reasonable inference that COINBASE knew that funds being exchanged by Vernon/CRYPTSY in their COINBASE accounts were being misappropriated from CRYPTSY accountholders would have triggered a duty of inquiry on COINBASE's part, and COINBASE's failure to conduct a reasonable inquiry when that obligation arose would result in COINBASE being charged with such knowledge as inquiry would have disclosed.  As explained above, there are myriad disputed issues of material fact as to these questions. Because the law and facts clearly show the existence of a fiduciary duty between CRYPTSY and the Plaintiff class by which CRYPTSY held its customers' assets in trust and that COINBASE had

knowledge of facts clearly warning that CRYPTSY was misappropriating those assets, Defendant's motion for summary judgment must be rejected.[6]

**4.** **The Evidence Supports a Finding of Willful Blindness That Establishes Defendant's Actual Knowledge of CRYPTSY's Tortious Conduct**

COINBASE's attempt to evade a finding of willful blindness on summary judgment is unavailing. To show willful blindness, as an alternative to actual knowledge, the plaintiff must prove that the defendant (1) subjectively believed there was a high probability a particular fact existed or was true, and (2) took deliberate actions to avoid learning of that fact. *Global–Tech Appliances, Inc. v. SEB S.A* 563 U.S. 754, 766 (2011); *Vasudevan Software, Inc. v. TIBCO Software Inc.*, C 11-06638 RS, 2012 WL 1831543, at *5 (N.D. Cal. May 18, 2012). Thus, even if required, there are disputed material facts as to the issue of willful blindness.

**B.   Negligence (Count III)**

As COINBASE would have the Court believe, COINBASE owed no duty to Plaintiff . . . but if a duty was owed, COINBASE did not breach that duty . . . but if COINBASE did breach that duty, Plaintiff suffered no damages as a result of that breach. To support its position, COINBASE relies heavily upon caselaw focused on the liability (or non-liability) of banks. To travel under that argument, COINBASE heavily cloaks itself in the favorable caselaw that has been rendered to banks that have been charged with legal violations like those asserted by Plaintiff against COINBASE herein.[7] As explained throughout this memorandum; COINBASE's efforts, however, fail for one simple, fundamental reason: COINBASE is not a bank.  Because it is not a bank, the authorities on which it relies to evade a duty owed to Plaintiffs is simply inapplicable.

---

[6] Defendant's extensive analysis of willful blindness is entirely superfluous. Plaintiff does not rely on willful blindness as the basis for his claims. Indeed, as Defendant correctly notes, the doctrine of willful blindness applies principally under criminal law and with respect to certain statutory civil claims such as intentional infringement of a patent or copyright. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). It has never been applied to a common law claim for aiding and abetting tortious conduct under California law, which is the law governing these claims. Plaintiff is not asking the court to extend the law to such claims. Rather, Plaintiff's argument, as detailed above, is based on the extensive circumstantial evidence from which a jury could reasonably infer that Defendant had actual knowledge of CRYPTSY's tortious conduct. *See Simi Management Corp.*, 930 F.Supp.2d at 1098 (denying summary judgment against aiding and abetting claim where circumstantial evidence established a basis for jury to reasonably infer actual knowledge).

[7] Motion at 13-15.

**1.** <u>Coinbase Owed a Duty to Plaintiff</u>

Looking instead to generally applicable law governing the existence of a duty, COINBASE owed Plaintiff and the class a duty of ordinary care to protect them from theft committed by COINBASE's customers. Under California law, "a duty of care may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society. *J'Aire Corp. v. Gregory*, 598 P.2d 60, 62 (Cal. 1979); *Heyer v. Flaig*, 449 P.2d 161, 164 (Cal. 1969), *superseded by statute on other grounds as stated in Laird v. Blacker*, 828 P.2d 691 (Cal. Ct. App. 1992). Even when the only harm is economic harm, a defendant may still be found to owe a duty to the injured plaintiff, even if there is no privity between the parties. *Id. at 63.* To determine if a duty is owed, in these situations, the courts must weigh several factors: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm. *J'Aire Corp.*, 598 P.2d at 63.[8]

The California Supreme Court recently clarified that where the only alleged harm is economic loss without any underlying personal injury or property damage, whether a duty exists "turns on a careful consideration of the 'sum total' of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors." *Southern California Gas Leak Cases*, 441 P.3d 881, 887 (Cal. 2019). Thus, no single factor alone determines whether a duty arises.

Considering each of the factors in *J'Aire Corp.* and weighing the totality of the circumstances as required by *Southern California Gas Leak Cases,* COINBASE owed the Plaintiff class a duty. As to the first factor, CRYPTSY and Vernon's transactions through COINBASE were not, strictly speaking, intended for the benefit of the Plaintiff class. However, there is still a direct relationship between those transactions and the Plaintiff class' rights to the assets from which COINBASE directly benefited. Those transactions were supposedly derived

---

[8] Florida applies a similar analysis to determine when a duty arises. *See McCain v. Florida Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). As explained by the Florida Supreme Court, "Where a defendant's conduct creates a *foreseeable zone of risk,* the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." *Id.*

directly from services CRYPTSY provided to Plaintiff and the class. Thus, COINBASE was the direct beneficiary of the transactions between CRYPTSY and Plaintiff, and COINBASE knew it.[9]

The second factor – foreseeability of harm to plaintiffs – substantially favors finding a duty. As stated by the California Supreme Court, "the court's task in determining duty 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed....' " *Kesner v. Superior Court*, 384 P.3d 283, 291 (Cal. 2016).

COINBASE operated in a highly risky business venture providing services that it knew created substantial risk of theft, fraud and money laundering by its customers and against those with whom its customers did business. Numerous government agencies specifically warned of these risks. COINBASE also knew that CRYPTSY was, itself, operating as a Money Services Business providing equally risky services to its own customers. Indeed, prior to closing CRYPTSY and Vernon's accounts, COINBASE's own bank partner sought to severely curtail COINBASE's continued provision of virtual currency exchange services to MSBs like CRYPTSY because doing so posed an unacceptable risk of fraud, theft and money laundering. Despite knowing these risks, COINBASE fought to retain CRYPTSY as its customer. In light of the well-known risks and warnings inherent in providing its services to MSBs, like CRYPTSY, it was clearly foreseeable that the provision of those services to businesses, like CRYPTSY, created a substantial risk to Plaintiff. Those known and foreseeable risks should be taken into consideration by COINBASE by imposing a duty of ordinary care on its business practices.

The third factor – the certainty that plaintiffs suffered injury – also weighs heavily in favor of imposing a duty on COINBASE. There simply is no dispute that Plaintiff suffered harm. His virtual currency was stolen and laundered through COINBASE's virtual currency exchange service. This is exactly the risk of which COINBASE had ample warning.

The fourth factor - the closeness of the connection between the defendant's conduct and the injury suffered – similarly favors imposing a duty on COINBASE. This factor is closely

---

[9] Of course, it was entirely untrue that the bitcoin CRYPTSY laundered through COINBASE was lawfully earned fees from the transactions completed by CRYPTSY's customers. However, this does not minimize the direct link between the transactions CRYPTSY processed through COINBASE and the relationship between CRYPTSY and its customers.

related to the question of foreseeability. *Id.* at 295. CRYPTSY's theft of Plaintiff's and the class' assets was the direct result of COINBASE's provision of virtual currency exchange services that allowed CRYPTSY and Vernon to convert their virtual currency into U.S. Dollars, which Vernon then transferred to his personal bank account and spirited away. This is precisely what this factor addresses. *Id.* It was eminently foreseeable that crooks and thieves would use COINBASE to convert ill-gotten virtual currency into fiat currency that they could then easily steal without a trace.

The fifth factor -- the moral blame attached to the defendant's conduct -- also rests squarely on COINBASE's shoulders. COINBASE put its own profits over any consideration of the known risks posed by providing its services to companies like CRYPTSY. It now seeks to absolve itself from any such responsibility by claiming the mantle of a banking institution. However, COINBASE was no bank. It was, at best, a lightly regulated business that provided little or no oversight of its customers operations. It was not subject to the strict capital margin requirements imposed on banks, and its account holders had no protection in the form of deposit insurance. COINBASE knowingly chose to operate a highly risky business in a highly risky and relatively untested and extremely volatile market where it had far superior knowledge and technical capability compared with individuals like Plaintiff. It thus had far superior tools to protect people like Plaintiff than Plaintiff had to protect himself. The moral obligation to exercise due care under these circumstances is clear.

The final factor -- the policy of preventing future harm -- is the final piece of the puzzle establishing a clearly defined duty. Imposing a duty of ordinary care on COINBASE will serve the greater public good in a limited and circumscribed manner. The duty to be imposed would not unleash unlimited liability even in the absence of physical harm. Rather, the duty would protect a very specific and defined set of individuals from well-known risks of fraud, theft and money laundering in an industry rife with such problems. Specifically, the duty would apply only to COINBASE's provision of its services to other MSBs where there is a known and heightened risk of fraud, theft, and money laundering. The duty would fall only on the party most able to protect the beneficiaries of the duty from the risk – namely the customers of MSBs who funnel virtual currency transactions processed on their own platforms through others like COINBASE. A duty of ordinary care would thereby begin to impose some order on the otherwise chaotic world of virtual currency markets that have led to repeated warnings to investors of the extreme

risks involved in participating in that market, especially with respect to MSPs. Put simply, imposing a duty on the companies that have the greatest resources and ability to protect those with far less ability to protect themselves will make these markets safer. *Id.* at 297.

Weighing all of the factors leads to the inescapable conclusion that COINBASE owed Plaintiff and the class a duty of ordinary care.[10]

### 2. The Evidence Demonstrates That COINBASE Breached Its Duty to Plaintiff

Defendant's argument that there is no evidence that it breached any duty owed to Plaintiff is both incorrect and internally inconsistent. On one hand, Defendant argues that the AML and BSA regulations do not create a duty owed by Defendant to Plaintiff and the class. In the very next section, Defendant argues that its alleged compliance with the AML and BSA regulations immunizes it from any finding of a breach of fiduciary duty. Defendant cannot have it both ways. If it claims that compliance with federal regulations is evidence that it did not breach a duty to Plaintiff, then evidence of its failure to comply with those same regulations should be equally permitted to show that Defendant did breach its duty to Plaintiff. *See Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.* 190 Cal.App.4th 1502, 1529 (Cal. Ct. App. 2010). Moreover, the fact that a defendant complies with a statutory or regulatory requirement is not *per se* proof that it was not negligent. It is merely evidence that a jury may consider and reject. *Id.* at 1526 ("Compliance with the law does not prove the absence of negligence.").

Moreover, under §669 of the California Evidence Code, Plaintiffs reliance on the BSA and AML statutes and regulations are permissible to establish negligence *per se*. The presumption is not of a duty, but of a standard of care created by the statute or regulation, the violation of which establishes the presumption of negligence. *California Service Station*, 62 Cal.App.4th at 1178. The presumption arises when: (1) the defendant violated a statute; (2) the violation proximately caused the plaintiff's injury; (3) the injury resulted from the kind of

---

[10] Defendants' reference to a "duty" *per se* created by statute is off-base. Def. Mot. p. 14-15. Plaintiffs do not claim that the AML and BSA regulations imposed a duty *per se* in favor of Defendants. Under California law, negligence *per se* does not establish the existence of a duty. *California Service Station and Auto. Repair Ass'n v. American Home Assur. Co.*, 62 Cal.App.4th 1166, 1178 (Cal. Ct. App. 1998). Rather, negligence *per se* is an evidentiary rule that allows the court to adopt statutory or regulatory requirements as the standard of care where a duty already exists. *Id.* If a defendant violates the statutory or regulatory requirements, a rebuttable presumption of negligence arises. *Id.*; *see also* Cal. Evid. Code. §669. As noted above, Coinbase's duty to Plaintiffs arises from general common law principals, not from the AML and BSA regulations.

occurrence the statute was designed to prevent; and (4) the plaintiff was one of the class of persons the statute was intended to protect. *Jacobs Farm/Del Cabo, Inc.*, 190 Cal.App.4[th] at 1526. The first two elements are "normally questions for the trier of fact and the last wo are determined by the trial court as a matter of law." *Id.*

As to the first element, as set forth in Plaintiff's expert witness report, there is substantial evidence that at the time of the theft of Plaintiff's assets, COINBASE was not in compliance with the BSA and AML regulations governing record keeping and reporting of suspicious activities, and its purported AML policy (or lack thereof) also failed to comply with the regulations. As the expert's report also makes clear, COINBASE failed to comply with even basic due diligence requirements, even absent the AML and BSA statutory/regulatory requirements.

As to the second element, the violation of these regulations was the foreseeable and thus proximate cause of Plaintiff's injuries; as adequate investigation, due diligence, and reporting required by the regulations would have revealed CRYPTSY's theft and put a stop to its/Vernon's conduct. The failure to do so resulted in the harm to Plaintiff and the class. Third, the injury resulted from the exact type of occurrence that the statute and regulations were designed to prevent – namely fraud, theft and money laundering. Finally, the statute, while principally a law enforcement tool intended to assist federal criminal, tax and regulatory investigations, is also intended to protect the customers of institutions from theft and money laundering by ferreting out such conduct and putting a stop to it. As stated by Plaintiff's expert:

> [A]n effective AML Program control environment includes: 1) a detailed risk assessment that was utilized to identify higher risk customer types, geographies, products/services to allow for the implementation of appropriate controls; 2) documented and fully implemented Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD") Programs, commonly referred to as Know Your Customer ("KYC"); 3) ongoing monitoring and controls that manage and mitigate the financial crime risk posed to the firm; and 4) investigative functions and documented procedures to ensure the timely identification and reporting of suspicious activity.

O'Connor Report at ¶50. The purpose of these regulations is therefore not simply to aid in government enforcement, but to mitigate and prevent criminal activity through the use of financial institutions.

Defendant's reliance on *Karen Kane, Inc. v. Bank of America* and *Wiand v. Wells Fargo Bank* are therefore misplaced. In *Karen Kane, Inc.*, the basis for the claim against the defendant

bank was that the bank negotiated allegedly fraudulently endorsed checks by which plaintiff's own employees embezzled money from the plaintiff. 67 Cal.App.4th 1192, 1203 (Cal. Ct. App. 1998). Plaintiff argued that federal AML regulations imposed a duty on the bank which it breached by not spotting the unusual endorsements. The court rejected this, finding that the AML regulations were not intended to identify wrongful endorsements or protect bank customers from their own faithless employees where the employer was more than able to protect itself. *Id.* at 1199. Here, in contrast, the theft/money laundering was squarely within the scope of what the AML regulations are intended to ferret out: unusual currency transactions that indicate concealment of the true source of the funds in order to steal or launder the funds for some nefarious purpose. Moreover, unlike the *Karen Kane* case, this case does not involve the plaintiffs' employees committing the theft; nor was the plaintiff in this case in any position to protect himself, as he was denied access to his account and prevented from taking any action to secure his assets against the theft. Finally, the *Karen Kane* case considered the far less strict AML requirements in place in 1998. Those requirements were substantially enhanced as of 2013-2015 when the transactions at issue here took place.

*Wiand* is also inapplicable here. In *Wiand*, the plaintiffs were victims of a Ponzi scheme that used the bank as its depository through which the fraudsters stole plaintiffs' money. 86 F. Supp. 3d 1316, 1321 (M.D. Fla. 2015). Plaintiffs argued that federal AML and BSA regulations imposed a duty on the bank by establishing a standard of care in the banking industry that the bank failed to meet. The court rejected this argument finding that the federal regulations only imposed duties that extended to the United States, not a bank's customers. However, the decision provides no supporting citation to any authority or to any provision of the regulations at issue. Moreover, the conclusion was premised on Florida negligence law, not California law. As noted, California law provides a specific statutory mechanism for imposing an evidentiary presumption of negligence based on a violation of a statutory or regulatory provision. In *Wiand*, the court did not consider the elements of the California statute; nor did its summary conclusion provide any analysis that would lead to a similar conclusion under California law. As noted above, based on California law, the opposite conclusion is warranted.

In sum, there is disputed record evidence as to whether Defendant violated federal AML and BSA regulations. Additionally, these regulations clearly are intended to protect not just the United States, but also bank customers, from the very types of misconduct at issue in this case.

There is simply no basis to conclude that Defendant did not breach its duty of care to Plaintiff as a matter of law.

Finally, even without the evidentiary presumption of negligence *per se*, there is substantial evidence that COINBASE breached the duty of care it owed to Plaintiff. Plaintiff's expert witness report points out COINBASE's numerous breaches of its basic duty to perform due diligence, particularly with respect to MSB customers like CRYPTSY who posed heightened risks of fraud, theft and money laundering. For example, Plaintiff's expert opined that:

> In my opinion, Coinbase's ongoing monitoring was not sufficiently tailored for the risks associated with Cryptsy as a high-risk customer relationship. Coinbase did not adequately understand Cryptsy's business model, including its fee structure, and did not ask these relevant questions as part of its diligence/investigations. Cryptsy's business practices as a high-risk cryptocurrency exchange conducting a high volume of bitcoin-to-U.S.-dollar currency conversion transactions should have alerted Coinbase and prompted Coinbase to fully understand and confirm the legitimacy of that high volume of activity.

> In my opinion, a reasonable investigation would have undertaken additional steps to determine if both the quantity and source of the bitcoin being deposited into the Cryptsy and Vernon Accounts, and thereafter liquidated and transferred out of Coinbase, was consistent with the explanations provided by Vernon to Coinbase.

O'Connor Report at ¶¶65, 66, Exh. KK. Regardless of any AML/BSA regulatory requirements, such conduct is direct evidence of a breach of duty to Plaintiff, as it shows not only a complete absence of any due diligence to prevent known risks, but an affirmative decision to knowingly profit from transactions that COINBASE itself refused to process on its own platform.

### 3. UNJUST ENRICHMENT

With minimal attention in less than a page of argument, COINBASE's Motion addressed Plaintiff's "Unjust Enrichment" claim (Count IV of the Class Action Complaint) and asserted that "*there is no merit in any unjust enrichment claim here.*"[11] However, COINBASE erroneously relies on Florida law for its argument when California law applies. Under California law, an unjust enrichment claim does not require that the plaintiff have personally conferred a direct benefit on the Defendant. Nor does California preclude unjust enrichment simply because the defendant gave "adequate consideration" for the benefit it received. *See Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and Co.*, Case No.13-cv-01180, 2015 WL 4755335

---

[11] Motion at 17.

(N.D. Ca. Aug. 11, 2915)   (conducting survey of states' unjust enrichment laws, including Florida and California).

Rather, to succeed on a claim for unjust enrichment under California law, a plaintiff must prove that "the defendant has been unjustly conferred a benefit 'through mistake, fraud, coercion or request." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  Even if the person who received the benefit claims they gave consideration for the benefit received, they may still be liable for unjust enrichment if the person "had notice of the circumstances before giving value or before receiving tittle or a legal interest in the subject matter." *First Nationwide Savings v. Perry*, 11 Cal.App.4[th] 1657, 1663 (Cal. Ct. App. 2013); *See also FDIC v. Dintino* 167 Cal.App.4[th] 333, 346 (Cal. Ct. App. 2008) ("the equitable remedy of restitution when unjust enrichment has occurred "is an *obligation* (not a true contract [citation] ) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.")

Under California law, Defendant's motion is entirely inapplicable to Plaintiff's unjust enrichment claim. Moreover, based on California law, Plaintiff has adduced substantial evidence that COINBASE, in fact, received a benefit from Plaintiff based on mistake or fraud and that COINBASE was on notice that its receipt of the benefit (namely the fees CRYPTSY and Vernon paid to COINBASE using Plaintiff's assets and for the privilege of stealing Plaintiff's assets) was the result of CRYPTSY's tortious conduct. COINBASE's motion for summary judgment as to Count IV must therefore be denied.

Further, even if Florida law applied, COINBASE's argument is wrong. COINBASE argues that *"Plaintiff's claim"* should be dismissed because *"Plaintiff did not confer any benefit on Coinbase or have any contact with Coinbase about Cryptsy or Mr. Vernon.*"[12]   COINBASE "erroneously equates direct *contact* with direct *benefit*." *Romano v. Motorola, Inc.*, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) (emphasis in original) (finding "unjust enrichment" claim adequately stated where benefit was unquestionably conferred, albeit through an intermediary). Whether Plaintiff had direct *contact* with COINBASE is immaterial. *Id.* As this Court has stated:

> Although Defendants are correct that the benefit conferred under an unjust-enrichment claim must be a direct benefit, the mere fact that there has been no

---

[12] *Id.*

direct contact between a defendant and the plaintiff does not preclude a finding that the defendant received a direct benefit from that plaintiff. In other words, just because the benefit conferred by Plaintiffs on Defendants did not pass directly from Plaintiffs to Defendants -- but instead passed through a third party -- does not preclude an unjust-enrichment claim. To hold otherwise would be to undermine the equitable purpose of unjust enrichment claims. It would not serve the principles of justice and equity to preclude an unjust enrichment claim merely because the "benefit" passed through an intermediary before being conferred on a defendant.

*Williams v. Wells Fargo Bank, N.A.*, 2011 WL 4368980, at \*9 (S.D. Fla. Sept. 19, 2011) (internal citations omitted). Here, the record demonstrates that Plaintiff did indeed confer a benefit upon COINBASE, even if that benefit passed through CRYPTSY and Vernon first.

COINBASE's argument that it gave "adequate consideration" to Vernon and CRYPTSY is likewise misplaced. First, evaluating whether consideration provided was "adequate" is a genuine issue of fact that is not appropriately decided on a Motion for Summary Judgment -- especially where, as here, the parties dispute the adequacy and propriety of the payments and services exchanged between COINBASE and Mr. Vernon/Cryptsy. *See*, *e.g.*, *In re Cassandra Group*, 312 B.R. 491, 498 (Bankr. S.D.N.Y. 2004) (denying summary judgment motion because "[f]airness of consideration is ordinarily a question of fact to be determined under the circumstances of the particular case"). Moreover, because the services provided by COINBASE to Vernon/CRYPTSY served to perpetuate an illegal fraud, the "value" conferred is illegal in its nature; and no exchange of reasonably equivalent value could have taken place. Defendant's motion for summary judgment directed to Count IV for unjust enrichment must therefore be denied.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

**BY:** ***/S/ MARC A. WITES***
Fla. Bar No.: 24783
mwites@witeslaw.com
**WITES LAW FIRM**
Attorneys for Plaintiff and the Class
4400 North Federal Highway
Lighthouse Point, FL 33064
954-933-4400/954-354-0205 (fax)

and

**SILVER MILLER**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone: (954) 755-4799
Facsimile: (954) 755-4684
DAVID C. SILVER
E-mail: DSilver@SilverMillerLaw.com
Florida Bar No. 572764
JASON S. MILLER
E-mail: JMiller@SilverMillerLaw.com
Florida Bar No. 095631

*Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a copy of the foregoing was served on this 5th day of August 2019 upon: **ANDREW KEMP-GERSTEL, ESQ. and JAMES R. LIEBLER, II, ESQ.**, LIEBLER, GONZALEZ & PORTUONDO, *Counsel for Defendant, Coinbase Inc.*, Courthouse Tower - 25th Floor, 44 West Flagler Street, Miami, FL 33130; and **STEVEN A. ELLIS, ESQ., LAURA STOLL, ESQ. and GALEN PHILLIPS, ESQ.**, GOODWIN PROCTER LLP, *Pro Hac Vice Counsel for Defendant, Coinbase Inc.*, 601 South Figueroa Street, Los Angeles, CA 90017.

*/s/ Marc. A. Wites*
MARC A. WITES