# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Civil Action No. 9:16-CV-81992-MARRA

BRANDON LEIDEL, Individually,
and on behalf of All Others Similarly Situated,

     Plaintiff,

v.

COINBASE, INC., a Delaware corporation
d/b/a Global Digital Asset Exchange (GDAX),

     Defendant.

_____/


## MEMORANDUM OF DEFENDANT COINBASE, INC.
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## <u>AND REQUEST FOR HEARING</u>

## INTRODUCTION

Plaintiff seeks to represent a sprawling class of unknown size, whose members cannot be identified, and who have disparate, and (at times) conflicting, claims. Plaintiff has not presented, and cannot present, evidence to show that the requirements of Federal Rule of Civil Procedure 23 are satisfied. This is especially true under the "rigorous analysis" standard that must be applied. Accordingly, Plaintiff's Motion for Class Certification (DE 113) should be denied.[1]

Throughout the Motion, Plaintiff repeatedly relies on this Court's certification of a different class in an earlier lawsuit that also arose out of the collapse of Project Investors, Inc. d/b/a Cryptsy ("Cryptsy"). *See* Mot. at 1, 13, 14, 17, 18; *Leidel et al. v. Project Investors, Inc., et al.*, Case No. 9:16-cv-80060 (S.D. Fla.) ("*Project Investors*"), DE 59, 65. In *Project Investors*, the class certification motion was unopposed and was presented in the context of a settlement.

There are critical differences, however, between Plaintiff's claims here and those in *Project Investors*. In *Project Investors*, Plaintiff sued Cryptsy, its principal Paul Vernon, and others for *all losses sustained by Cryptsy's account holders*. All of the losses. Every penny. One hundred percent of the digital currency that account holders deposited with Cryptsy and lost.

Here, in contrast, Plaintiff sued Coinbase for aiding and abetting, negligence, and unjust enrichment based upon a subset of $8.2 million worth of digital currency that Cryptsy and Mr. Vernon deposited at Coinbase and exchanged for U.S. dollars between May 23, 2013 and October 4, 2015. That means that Plaintiff's claims against Coinbase are significantly narrower than those asserted in *Project Investors*. Among the categories of alleged losses ***included*** in *Project Investors* but ***excluded*** from any claim against Coinbase are the following:

- All losses that occurred before June 2014. That is when, according to the Complaint, Coinbase first "knew" or "should have known" of Mr. Vernon's criminal conduct. Complaint, ¶¶ 59-64, 68, 84-85. 91-93, 99-100.

- All losses that occurred after October 4, 2015. That is the last date on which Coinbase provided exchange services to Cryptsy and Mr. Vernon. Ex. 106 at CB127; Ex. 105 at CB212.[2]

---

[1] Because Coinbase's pending Motion for Summary Judgment ("MSJ") (DE 100) may prove dispositive, Coinbase respectfully suggests that the Court rule on the MSJ first.

[2] Unless otherwise indicated, the referenced exhibits ("Ex. __") are attached to the accompanying Declaration of Galen A. Phillips.

- All losses that occurred as a result of a massive hack on July 29, 2014, in which third-party criminals stole approximately $8 million worth of digital currency belonging to Cryptsy's account holders.  Ex 135; Ex. 139 at 16-17.
- All losses that occurred as a result of digital currency that was (allegedly) stolen from Cryptsy's account holders but not deposited into the accounts that Cryptsy and Mr. Vernon maintained at Coinbase.
- The portion of the $8.2 million worth of digital currency that was earned by Cryptsy or Mr. Vernon from trading fees or mining operations.  Those sums belonged to Cryptsy or Mr. Vernon, not Cryptsy's account holders.

These differences are critically important to a rigorous analysis of Rule 23's requirements – but Plaintiff does not mention them in his Motion.  Moreover, as Plaintiff concedes (Mot. at 16), all records identifying Cryptsy's account holders, the amount of their holdings, and the dates and amounts of their transactions have been destroyed and cannot be recovered.  As a result, Plaintiff cannot satisfy the requirements of Rule 23.  More specifically:

First, the class is not ascertainable.  Plaintiff cannot identify, and offers no administratively feasible method for identifying, the overwhelming majority of class members.

Second, Plaintiff's claims are not typical.  Plaintiff maintained some transaction records, and those records show that (a) in certain respects, his claims are subject to legal defenses that do not apply to other class members and (b) in other respects, his claims are not subject to critical defenses that Coinbase has, and is entitled to litigate, against other class members.

Third, Plaintiff and his counsel have not shown that they can adequately represent the class.  There are significant conflicts among class members, but Plaintiff fails even to acknowledge these conflicts, much less show how he and his counsel can manage them in a way that ensures that all class members receive adequate representation at all times.

Fourth, there are myriad individual issues that predominate over common issues in this litigation.  These individual issues include differences in state law as well as variations in the claims of class members based upon, for example, when they made their transactions and what happened to their digital currency (who allegedly stole it and where it went).  These issues relate to both liability and damages.  They cannot be resolved on a class wide basis "in one stroke."

Fifth, and finally, a class action is not a superior, desirable, or manageable method for resolving the claims asserted here.

2

## BACKGROUND FACTS AND PROCEDURAL HISTORY[3]

In 2013, Paul Vernon created Cryptsy, a web-based trading platform for digital currency (also called "cryptocurrency"). Complaint, ¶ 24. Ex. 126 at 30:20-31:10; 111:23-25. Cryptsy allowed users to store and trade Bitcoin and scores of other digital currencies. Complaint, ¶¶ 28-30; Ex. 119 128:12-129:20; Ex. 121 at 184:14-19; Ex. 116 at 78:21-79:6; Ex. 125 at 113:23-114:18. Cryptsy was based in Florida, but it had users from across the country and around the world. Ex. 141; *e.g.* Mot. Exhs. BB1.1; BB1.2; BB1.5.

Initially, Cryptsy was successful. By mid-2014, Cryptsy had "approximately 230,000 registered users; its trades per day exceeded 300,000; and it made available 150 different types of cryptocurrencies for its users to trade." Complaint, ¶ 41; Mot. at 3.

Cryptsy earned revenue from trading fees. Cert. Mot., at 2; Ex. 125 at 103:9-104:7; Ex. 116 at 78:17-20; Ex. 121 at 102:2-104:16; Exs. 131-132. According to financial documents that Mr. Vernon produced in his divorce proceedings, Cryptsy earned a total of more than $3 million in trading fees in 2013 and 2014 alone. Exs. 131-132.

Cryptsy collected its trading fees in the form of various digital currencies supported by its platform; Cryptsy then converted those fees into Bitcoin. Ex. 125 103:9-104:7; 106:4-107:22. In May 2013, Cryptsy opened a corporate account at Coinbase to exchange its trading fees (in Bitcoin) into U.S. dollars. Ex. 139 at 8. Mr. Vernon also opened a separate personal account at Coinbase. Ex. 102 at 1 & 6, Ex. 105, Ex. 123 at 132: 2-17.[4] Both Cryptsy and Mr. Vernon personally were involved in mining – that is, earning digital currency for participating in the transaction confirmation process. Ex. 126 at 30:20-31:13; Ex. 121 at 173:1-174:1.

In July 2014, third-party criminals hacked into Cryptsy's computers and stole more than 13,000 bitcoin and 300,000 Litecoin (then worth more than $8 million) from Cryptsy's account holders. Ex 135; Ex. 139 at 16-17. Plaintiff alleges that at some point, Mr. Vernon also started stealing from account holders. Complaint ¶¶ 50, 146. And, for a while, Mr. Vernon may have run Cryptsy as a Ponzi scheme, using new deposits to fund withdrawal requests. Ex. 124 at

---

[3] Coinbase has set forth the factual background for this litigation in detail in its pending MSJ. The facts pertinent to class certification are summarized below.

[4] Plaintiff falsely asserts that Cryptsy's corporate account at Coinbase was linked to Vernon's personal bank account. Mot. at 4. In fact, Cryptsy's corporate account at Coinbase was linked to Cryptsy's corporate bank accounts, as acknowledged by the Receiver. Ex. 123 at 63:7-64:19; Ex. 103 at 1 & 5, Ex. 106, Ex. 125 at 110:15-112:19.

252:3-253:8; Ex. 121 at 140:13-22.  No one at Coinbase knew about any alleged criminal activity by Mr. Vernon.  Ex. 117 at 76:23-77:5, 84:18-25, 115:2-8, 153:21-155:14.  Neither did the executives of Cryptsy, who worked closely with Mr. Vernon every day.  Ex. 125 at 27:9-28:3, 46:19-50:8, 99:11-100:4; Ex. 116 at 17:3-11, 79:7-14; Ex. 121 at 29:10-16, 33:22-34:4, 42:3-46:10, 36:18-37:3, 40:7-23, 121:10-123:16, 140:23-143:12, 119:14-148:17.

Coinbase, as part of its extensive anti-money laundering procedures, conducted diligence on Cryptsy's corporate account and Mr. Vernon's personal account at various times in 2014 and 2015.  Ex. 102 at 2-5; Ex. 103 at 2-4.[5]  Following news reports of a criminal investigation into Cryptsy, as well as further diligence, Coinbase closed both accounts.  Exs. 109-110; Ex. 111 at CB5026; *see also* Ex. 118 at 103:17-104:18.  No exchange services were provided to Cryptsy or Mr. Vernon after October 4, 2015.  Ex. 106 at CB127; Ex. 105 at CB212.

Cryptsy continued to operate for three more months.  During this time, Cryptsy used another company, Bitfinex, to exchange Bitcoin for US dollars.  Ex. 126 at 54:3-16; Ex. 114 at 105:8-107:10.  Also during this time, Plaintiff made 27 separate deposits into his Cryptsy account in an amount totaling approximately 14 bitcoin.  See Ex. 142.  Plaintiff withdrew 3.78 bitcoin from his account on December 8, 2015, and 2.98 bitcoin on January 11, 2016.  Exs. 143-144; *see also* Ex. 119 at 108:22-110:2; Ex. 120 at 174:5-18.

On January 14, 2016, Cryptsy announced that it would no longer allow customers to withdraw their digital currencies.  Ex. 135.  Cryptsy's website was subsequently deactivated and users could no longer access their account records.

In January 2016, the *Project Investors* litigation was filed as a class action against Cryptsy and Mr. Vernon.  Later, Mr. Vernon's ex-wife (Lori Ann Nettles) and a business investor (Kaushal Majmudar) were added as defendants.  *Project Investors* DE 1, 8, 94.

In April 2016, the Court appointed Mr. James Sallah as Receiver for Cryptsy.  Complaint, Ex. A.  The day the Receiver was appointed, someone deleted all of Cryptsy's account records, "shredding" the server so thoroughly that the information could not be recovered.  Ex. 139 at 4-5; Ex. 121 at 265:4-266:13.  Mr. Sallah informed the Court that, because of the shredding, it was "impossible … to determine or know on Cryptsy's end: (1) what is currently owed to each

---

[5] Plaintiff falsely asserts that Coinbase did not have anti-money laundering policies and procedures in place at the time relevant to this lawsuit or made exceptions to these policies for Cryptsy because it was a large customer.  Mot. at 6-7.  That is fiction.

Cryptsy account holder; (2) what cryptocurrencies/coins and amount of same each account holder had in his/her Cryptsy account during Cryptsy's operations, including at the time Cryptsy shut off access to account holders; and (3) the identity and contact information of all of Cryptsy's account holders." Ex. 139 at 5.

Plaintiff negotiated settlements with Ms. Nettles and Mr. Majmudar in the total amount of approximately $1.5 million. Plaintiff then filed unopposed motions for class certification and settlement approval, which this Court granted. Mr. Vernon never appeared (he has, according to Plaintiff, fled to China). The Court entered a final default judgment against him, awarding the members of the class ownership of 11,325 bitcoin in identified wallets (the coins stolen in the 2014 hack), but Plaintiff and his counsel have not yet been able to access this digital currency.

Out of a class of more than 230,000 members,[6] the Settlement Administrator sent notices to 61,592 people. *Project Investors* DE 110 at 7. The remaining class members (approximately 75 percent of the class) received no individual notice. To share in the settlement proceeds, putative class members were required to complete a claim form listing the member's digital currency holdings at Cryptsy and the source of those holdings. Ex. 145 at 16-17. Class members were also required to submit documentary proof of their holdings as of November 1, 2015 or later (through, for example, saved screen shots) and a verification. Ex. 145 at 21. If class members did not have such proof, their claim would be denied. *Id.*

Only 1,849 individuals submitted claim forms. *Project Investors* DE 138. Of those, more than sixty percent were rejected as insufficient; only 681 individuals (less than 0.3 percent of the class) were treated as identified class members. *See Project Investors* DE 1, 135. Those 681 people divided, pro rata, 100 percent of the net settlement proceeds. The other 99.7 percent of the class received no money – but did, pursuant to the settlement agreement, provide a full and complete release to the settling defendants. Ex. 145 at 28.

Plaintiff filed the instant lawsuit against Coinbase in December 2016. Plaintiff sought to bring his claims on behalf of himself and:

---

[6] In his Motion, Plaintiff states that by the middle of 2014, Cryptsy had "approximately 230,000 registered users." Mot. at 3. Cryptsy remained in business for an additional 18 months, and presumably new individuals opened accounts throughout this period. In the absence of more reliable evidence, Coinbase uses the figure of 230,000 registered users as the likely approximate size of the class (solely for purposes of this Opposition, and reserving all rights).

All CRYPTSY account owners who: (1) deposited Bitcoins, alternative cryptocurrencies, or any other form of monies or currency at CRYPTSY, (2) had such currency liquidated by VERNON and CRYPTSY through COINBASE, and (3) have been denied access to their accounts and funds *between May 22, 2014 and the present dat*e.

Complaint ¶ 117 (emphasis added).  Plaintiff now moves to certify a nationwide class, or in the alternative a Florida-only class.  Mot. at 16.  Both classes differ from the one identified in the Complaint.  *See id.* (defining classes as account owners who held currencies "as of November 1, 2015 to the present").

## LEGAL STANDARD

A "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  To certify a class, Plaintiff has the burden of showing, with evidence, that each requirement for class certification is satisfied.  *Id.* at 350; *Vega v. T-Mobile USA*, 564 F.3d 1256, 1267 (11th Cir. 2009); *Cotromano v. United Technologies*, 2018 WL 2047468, at *9 (S.D. Fla. May 2, 2018) (Marra, J.).  The Court must conduct a "rigorous analysis" to determine whether Plaintiff has satisfied his evidentiary burden.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Dukes*, 564 U.S. at 350-51.  This includes an evaluation of "the claims, defenses, relevant facts, and applicable substantive law," and how they would play out at trial.  *Vega*, 564 F.3d at 1266.  Where "the addition of more plaintiffs is likely to require presentation of significant amounts of new evidence," class certification is generally improper.  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004); *In re Chiquita Brands Int'l Alien Tort Statute & Shareholders Derivative Litig.*, ___ F.R.D. ___, 2019 WL 2314448, at *8 (S.D. Fla. May 31, 2019) (Marra, J.) ("*Chiquita*").

## ARGUMENT

Plaintiff has not satisfied, and cannot satisfy, the implied and express requirements for class certification.[7]  As a result, his Motion should be denied in its entirety.

_____

[7] Plaintiff must also establish Article III standing.  *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002).  As Coinbase has shown in its MSJ, there is no causal link between Coinbase's alleged conduct and Plaintiff's loss – and therefore his injury is not "fairly traceable" to Coinbase.  This issue can be adjudicated in the context of the MSJ, rather than as a constitutional question here, but Coinbase disputes Plaintiff's contention (Mot. at 15) that he has standing.

I.      **PLAINTIFF CANNOT SATISFY THE IMPLIED REQUIREMENT THAT HE DEFINE HIS PROPOSED CLASS ADEQUATELY AND PROPERLY.**

A proposed class must be "clearly ascertainable."  *Little v. T-Mobile USA*, 691 F.3d 1302, 1304 (11th Cir. 2012).  In addition, it must be "adequately defined" and cannot include persons with no claim.  *Id.*; *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857, 861 (11th Cir. 2012).

A.      **The Proposed Class Is Not Ascertainable.**

The existence of an ascertainable class is an implied prerequisite of Rule 23.  *Little*, 691 F.3d 1304; *Chiquita*, 2019 WL 2314448 at *7.  For a class to be ascertainable, a plaintiff must show (1) that the class is defined "by reference to objective criteria" and (2) that these objective criteria can be applied in an "administratively feasible" way.  *Little*, 691 F.3d at 1304; *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x. 782, 787 (11th Cir. 2014).  This test is not met simply by defining the class with words that are, in the abstract, objective.  Rather, the second part of the test requires the court to determine whether it can in fact determine who is (and is not) in the class without individualized, person-by-person fact finding.  *Karhu v. Vital Pharm.*, 621 F. App'x. 945, 948 (11th Cir. 2015); *Bussey*, 562 F. App'x at 787; *Chiquita*, 2019 WL 2314448 at *7; *Bouton v. Ocean Properties*, 322 F.R.D. 683, 696 (S.D. Fla. 2017).

Here, the class is not ascertainable for one simple reason: Cryptsy's records were all destroyed in April 2016 when the server was shredded.  Ex. 139 at 4-5; Ex. 121 at 265:4-266:13.  Despite the best efforts of the Receiver and his team of experts, Cryptsy's transaction records and customer data could not be recovered.  Ex. 139 at 4-5.

This point is undisputed and dispositive: neither Plaintiff nor anyone else knows, or has any ability to find out, who the account holders are.  Nor does anyone know when or how much cryptocurrency each account holder deposited with Cryptsy, when or how much cryptocurrency each account holder withdrew, how much cryptocurrency each account holder lost when Cryptsy stopped processing withdrawals, or any other information about account holder transactions.

Thus, this is the paradigmatic example of an unascertainable class.  We simply do not know – and have no way of knowing – who the class members are.

Rather than confront this critical issue, Plaintiff attempts to avoid it by suggesting that class members can self-identify by producing "(a) CRYPTSY account statements that evidence their status as CRYPTSY account owners and their holdings (see Exh. BB1), (b) emails and other documents they received from CRYPTSY (see Exh. BB2) and (c) declarations."  Mot. at 16.  There are, however, multiple problems with this approach.

First, and foremost, Plaintiff is proposing to replicate the same process that was used in the *Project Investors* settlement. But that process was a failure – at least in identifying class members. Of the approximately 230,000 potential class members, fewer than 2,000 (less than 1 percent) submitted claims, and approximately two-thirds of those were rejected because they did not include sufficient proof. *Project Investors* DE 135 at 2. At the end of the process, only 681 individuals (less than 0.3 percent) were treated as identified class members. *Id*.

In other words, what Plaintiff proposes is a "self-identification" procedure that has already been tried and failed. Using this procedure, perhaps a tiny fraction of the class (under 1 percent) will come forward and be identified. But the other 99 percent will remain unidentified, and even after the litigation is complete, the parties will be left to speculate about who was (or was not) in the class and therefore bound by the judgment. This is precisely the result that the ascertainability requirement is meant to prevent. *See Karhu*, 621 F. App'x. at 948 n.3.

Moreover, this is only one of the defects in Plaintiff's proposal. Self-identification can be used only when it is "administratively feasible and not otherwise problematic." *See id.* at 948; *Chiquita*, 2019 WL 2314448 at \*8 (denying certification where individualized fact-finding was required to determine class membership); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) (rejecting self-identification where the "only evidence likely to be offered … will be the putative class member's uncorroborated claim that he or she used the product").

Here, to determine membership in the class, the Court would need to consider the transaction history for each of hundreds of individual claimants (or perhaps more, if Plaintiff is more successful in generating responses than he was in *Project Investors*). For example, individuals who are within the class definition proposed by Plaintiff would not in fact have any viable claims against Coinbase under the theories set forth in the Complaint, and therefore would not be properly included within the class, if they fell into any of the following categories:

- They lost all their holdings before the time (in June 2014) when Coinbase (allegedly) first "knew" or "should have known" of Mr. Vernon's conduct.
- They lost all their holdings as a result of the July 2014 hack.
- They lost all their holdings as a result of Mr. Vernon's conduct unrelated to the Coinbase accounts (*e.g.*, Mr. Vernon stole their digital currency, absconded to

China, and transferred the currency to a wallet he controls from China or used
another company to exchange the currency for dollars or Chinese Yuan).[8]

- They created their Cryptsy account, made all their deposits, or had their account
  balance fall to zero on or after October 4, 2015.

Thus, class membership cannot be determined without an individualized, one-at-a-time, inquiry
that is the opposite of a "manageable process." *Bussey*, 562 F. App'x. at 787; *see also, e.g.,*
*Bouton*, 322 F.R.D. at 696 (denying certification where there was no "feasible method to
determine the identity of the class members without resorting to ... individualized inquiry").

Compounding the problem with self-identification is the fact that most account records
have been destroyed.  Some class members will, perhaps, attempt to establish class membership
by combining incomplete records with their uncorroborated memory, but Coinbase has a right to
challenge whether certain individuals belong in the class.  "[A]llowing class members to self-
identify without affording defendants the opportunity to challenge class membership provide[s]
inadequate procedural protection to ... [d]efendant[s] and implicate[s their] due process rights."
*Karhu*, 621 F. App'x at 948-49.  Where, as here, determining class membership would require an
individualized, fact-specific inquiry, the class is simply not ascertainable. *Id.*; *Guarisma v. Hyatt*
*Equities*, 2017 WL 6949266, at *5-7 (S.D. Fla. Sept. 28, 2017).[9]

Finally, Plaintiff cannot avoid these issues by pointing to this Court's granting of an
unopposed motion for certification of a settlement class in *Project Investors*.  In the *Project*
*Investors* lawsuit, the scope of the relief sought was broader and included all amounts that
account holders lost – whereas here, Plaintiff and the members of the class seek to recover only a
portion of the loss (the portion that was transmitted to Coinbase during the time period that
begins when Coinbase "knew" or "should have known" of Mr. Vernon's criminal conduct and

---

[8] Plaintiff initially defined his class to be limited to only those individuals whose digital currency
was "liquidated by Vernon and Cryptsy through Coinbase."  Complaint, ¶ 117.  Although
Plaintiff now omits that limiting language in the class definition in his Motion, it would be
improper to include in the class individuals whose loss had nothing to do with the alleged
conduct of Coinbase.  Moreover, Plaintiff cannot expand the class definition at this point, when
the deadline to amend his complaint has long passed.  *See Bouton*, 322 F.R.D. at 693-94.

[9] *See also Dukes*, 564 U.S. at 367 (noting that a class action defendant has a due process right to
assert its defenses to each class member's claims); 28 U.S.C. § 2072(b) (federal procedural rules
may not "abridge, enlarge, or modify any substantive right").

ends no later than October 4, 2015).  Moreover, to the extent that there were potential defenses relating to the timing of transactions in the *Project Investors* lawsuit, the settling defendants agreed to waive those defenses as part of the settlement, in exchange for a complete release from class members.  Here, in contrast, Coinbase is waiving nothing and will vigorously contest every element of the claims asserted by Plaintiff (and the members of the putative class).

In sum, the method of self-identification proposed by Plaintiff is neither administratively feasible nor consistent with Coinbase's due process rights.  For that reason, the class is not ascertainable, and the Motion should be denied.  *E.g., Cotromano*, 2018 WL 2047468 at *12 (denying certification based on absence of "objective manner by which Defendant's alleged misconduct could be logically tethered to all property owners"); *Guarisma,* 2017 WL 6949266 at *6 (denying certification where determining class membership would have required individual filings by each class member).

### B.   The Proposed Class Is Fatally Overbroad.

Even an ascertainable class should not be certified if the class is defined in such an overly broad manner that it includes individuals who were not injured by the challenged conduct.  *See Walewski*, 502 F. App'x at 861 (rejecting class of video game purchasers that "impermissibly include[d] members who have no cause of action"); *Cotromano*, 2018 WL 2047468, at *10-12 (applying rule); *Keleczeny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660, 677-78 (S.D. Fla. 2009) (same); *O'Neill v. Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 477-78 (S.D. Fla. 2006) (same). That is precisely the case here.  As explained above, the class, as defined, includes, for example, individuals who made all their deposits after October 4, 2015, or who lost all their holdings because of the third-party hack, or who lost all their holdings before Coinbase (allegedly) "knew" or "should have known" of Mr. Vernon's criminal conduct.  Individuals in these categories have no claim against Coinbase under the theories alleged in the Complaint and do not belong in the class.  Because of this overbreadth, the Motion should be denied.

## II.   PLAINTIFF CANNOT ESTABLISH NUMEROSITY.

A plaintiff must demonstrate a proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 664 (S.D. Fla. 2014).  This determination of numerosity cannot be made here, however, because the class itself is not ascertainable, and in any event Plaintiff presents only speculation regarding class size.  *Vega*, 564 F.3d at 1267-68 (a plaintiff "cannot satisfy the

numerosity requirement through speculation"); *Guarisma*, 2017 WL 6949266, at *7.  If Plaintiff revises his class definition yet again, Coinbase reserves the right to contest numerosity.

Moreover, to the extent that Plaintiff seeks certification of his alternative, Florida-only, class, Plaintiff has completely failed to meet his burden of establishing numerosity.  There is no evidence in the record of how many class members (other than Plaintiff) are Florida residents.

## III.    PLAINTIFF CANNOT ESTABLISH COMMONALITY.

Plaintiff attempts to establish commonality under Rule 23(a)(2) by providing a laundry list of asserted common issues.  Mot. at 19-21.  The Supreme Court has condemned this practice. *Dukes*, 564 U.S. at 350 ("What matters ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.").  A plaintiff must demonstrate that the adjudication of common issues will help allow the claims of the class to be resolved in "one stroke."  *Id.*

In a Rule 23(b)(3) class action, there is substantial overlap between commonality and the more stringent test of predominance.  *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016); *Chiquita*, 2019 WL 2314448 at *6.  Accordingly, Coinbase addresses issues of commonality and predominance below, in section VI., under the heading of predominance.

## IV.    PLAINTIFF CANNOT SHOW THAT HIS CLAIMS ARE TYPICAL.

Under the typicality requirement of Rule 23(a)(3), there must be a "sufficient nexus" between the claims of the plaintiff and class members.  *Piazza v. Ebsco Indus.*, 273 F.3d 1341, 1346 (11th Cir. 2001).  Typicality is absent when "proof of the representatives' claims would not necessarily prove all of the proposed class members' claims."  *Bouton*, 322 F.R.D. at 699 (quoting *Conigliaro v. Norwegian Cruise Line*, 2006 WL 7346844, at *7 (S.D. Fla. 2006)).

Here, Plaintiff's claims are not typical of the claims of the class.  As explained above, the claims of the class do not include, for example, (a) losses sustained *before* Coinbase first "knew" or "should have known" (as Plaintiff alleges) of Mr. Vernon's criminal conduct in June 2014; (b) losses that resulted from the massive theft that Cryptsy and its account holders experienced in July 2014 from a third-party criminal hack; (c) losses that did not involve stolen digital currency deposited into the two Coinbase accounts at issue; and (d) all losses sustained *after* October 4, 2015, when Coinbase stopped providing exchange services to Cryptsy and Mr. Vernon.

Plaintiff Leidel, however, did not deposit any cryptocurrency into his Cryptsy account until August 2014.  Ex. 142.  Accordingly, litigating Plaintiff's individual claim will not give

11

Coinbase the opportunity to present evidence in support of two critical defenses that it has to the claims of other class members: that Coinbase has absolutely no responsibility for losses that were sustained either (a) before Coinbase allegedly first "knew" or "should have known" of Mr. Vernon's criminal conduct (in June 2014); or (b) as a result of the third-party hack that occurred in July 2014.  For that reason alone, Plaintiff's claims are not typical.

In addition, to prevail on his individual claims, Plaintiff must overcome unique defenses that many (or potentially most) other class members do not face.  Specifically, Plaintiff made 27 deposits into his Cryptsy account in the period after October 4, 2015.  Ex. 142.  At trial, Coinbase will argue that it has a complete, or at least a partial, defense to Plaintiff's claim for the loss of that digital currency because it occurred after both: (a) Coinbase stopped providing exchange services to Cryptsy and Mr. Vernon; and (b) websites publicly reported on a criminal investigation of Cryptsy.  These defenses apply to Plaintiff's claims but may not apply to the claims of class members who did not make any deposits after October 4, 2015.

Accordingly, Plaintiff's claims are meaningfully different from the claims of other class members.  They are not typical of the claims of class members who made deposits *earlier than* Plaintiff (and whose claims are thus subject to additional defenses ).  Nor are they typical of the claims of class members who did *not* make deposits as late as Plaintiff did (and whose claims are thus not subject to defenses that Plaintiff himself must overcome).  For these reasons, Plaintiff cannot satisfy the requirements of Rule 23(a)(3).

## V.   PLAINTIFF HAS NOT SHOWN HOW HE AND HIS COUNSEL WILL ADEQUATELY REPRESENT THE PROPOSED CLASS.

Plaintiff and his counsel must establish they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003).  "This 'adequacy of representation' analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003).[10]

---

[10] As a threshold matter, Plaintiff is an inadequate class representative because he has a substantial criminal record and a history of substance abuse and therefore may not be seen as credible or reliable.  Ex. 146, Ex. 119 at 34:12-19; *see also Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987).

The claims process in the *Project Investors* settlement created a conflict between two groups: (a) a favored group consisting of Plaintiff and 680 other class members who submitted approved claims with the required documentation and verification; and (b) a disfavored group consisting of the remaining 230,000 potential members of the class, who either did not have or did not submit such documentary evidence.  The favored group shared in the proceeds from the *Project Investors* settlement.  *Project Investors* DE 135 at 2.  The disfavored group – 99 percent of the class – released their claims against the settling defendants but received no payment at all.  Ex. 145 at 28.  The settlement proceeds attributable to the alleged losses of the disfavored group were instead redistributed to the favored group.

Plaintiff concedes that in this litigation the same problematic distinction between class members who have documentation and those who do not is likely to arise again.  *See* Mot. at 16.  But neither Plaintiff nor his counsel explain how they will adequately represent these two separate groups, who have different and potentially conflicting interests.  In the absence of such an explanation, Plaintiff and his counsel have not shown that they can or will adequately represent the class.  *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) ("a class cannot be certified when its members have opposing interests").

Plaintiff may respond by arguing that the adequacy of representation in *Project Investors* cannot be questioned because this Court approved the settlement.  But the right of class members to adequate representation exists independently of the Rule 23(e)(2) provisions for approval of a class action settlement.  Both Rule 23 and the Due Process Clause of the U.S. Constitution require "a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation."  *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1374 (11th Cir. 1984); *see also Phillips Petroleum v. Shutts*, 472 U.S. 797, 812 (1985).

## VI.   PLAINTIFF CANNOT SATISFY THE REQUIREMENTS OF RULE 23(B)(3).

Even if Plaintiff met all requirements for certification under Rule 23(a) (which he has not), he would still have to satisfy the predominance, superiority, and manageability requirements of Rule 23(b).  *Klay*, 382 F.3d at 1250.  This he cannot do.

A.   **Plaintiff Cannot Show That Common Issues Will Predominate Over Individualized Ones.**

1.   **A Nationwide Class Cannot Be Certified Because Of The Variations In The Laws Of The 50 States.**

Plaintiff seeks to certify a nationwide class asserting state law claims.  Mot. at 16, 25;

Complaint ¶¶ 116-123.[11]  Applying Florida choice-of-law rules, it is clear that the substantive

laws of many different states (perhaps all 50 states) will apply to the claims of the class.  This

precludes a finding of predominance (and also makes a trial unmanageable).  As the Eleventh

Circuit has stated, "[C]lass certification is impossible where the fifty states truly establish a large

number of different legal standards governing a particular claim."  *Klay*, 382 F.3d at 1261.

a.   **The Law Of The State Of Residence Of Each Putative Class Member Applies To The Claims In The Complaint.**

Because this case is in federal court under diversity jurisdiction, the conflict of law rules

of Florida, the forum state, govern.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496

(1941).  In *Bishop v. Fla. Specialty Paint Co.*, 389 So.2d 999 (Fla. 1980), the Florida Supreme

Court adopted the Restatement's "most significant relationship" test to resolve conflicts of laws

involving state tort law claims.  *Id.* at 1001.  Under this test, the Court must consider four factors:

"(a) the place where the injury occurred, (b) the place where the conduct causing the injury

occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of

the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Id.*

(quoting Restatement (Second) of Conflict of Laws § 145 (1971)); *see also, e.g., Green Leaf*

*Nursery v. E.I. DuPont De Nemours and Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003); *Garcia v.*

*Pub. Health Trust of Dade Cnty.*, 841 F.2d 1062, 1064-65 (11th Cir. 1988).

In the *Bishop* case, the Florida Supreme Court rejected an "inflexible place of injury

rule."  389 So.2d at 1001.  Nonetheless, the Court noted that "[t]he state where the injury

occurred would, under most circumstances, be the decisive consideration in determining the

applicable choice of law."  *Id.*  Judges within this District have repeatedly applied this principle.

*E.g., Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1327 (S.D. Fla. 2012) (applying

Florida law to tort claims of Florida resident against Massachusetts bank), *aff'd*, 749 F.3d 938

(11th Cir. 2014); *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1333-34 (S.D.

---

[11] Although Cryptsy had a substantial number of international users, Plaintiff apparently does not seek to represent them.  *See, e.g.,* Mot. at 16 (seeking certification of a "nationwide" class).

Fla. 2016) (applying Florida law to claims of Florida residents against defendant headquartered in California).  Here, too, the application of the four-factor test of *Bishop* establishes that the law of each class member's home state governs the claims asserted in the Complaint.

First, the most important factor  – where the alleged injury occurred – weighs strongly in favor of applying the law of each class member's home state.  Cryptsy's account holders opened their accounts online, made their deposits online, engaged in trades online, and ultimately experienced the losses that are the subject of this lawsuit when they were unable to recover their digital currency in their online Cryptsy accounts.  All of this activity occurred when class members used their own computers in their own home states.

The second factor, where the conduct causing the injury occurred, does not weigh heavily in favor of any one state.  The conduct that caused the alleged injury in this case occurred primarily in Florida and China (and perhaps elsewhere), where Mr. Vernon committed the alleged theft.  Secondarily, some additional element of the conduct occurred in California, where Coinbase has its main office and allegedly failed to prevent the criminal activity described in the Complaint that was committed by Mr. Vernon in Florida and China.

The third factor, the location of the parties, also does not weigh heavily in favor of any one state.  Class members reside in various states across the country.  Coinbase maintains its main office in California and is incorporated in Delaware.

The fourth factor, regarding where the "relationship" between the parties is "centered," is neutral, as Plaintiff himself concedes.  Mot. at 27.  There was no contract or other business relationship between the members of the putative class and Coinbase.  *Id.* at 1-2, 27.  Class members did, however, have a contractual relationship with Cryptsy; that relationship was "centered" in either the home state of each class member or in Cryptsy's main office in Florida.

In sum, the first factor strongly supports a conclusion that the law of each class member's home state should govern, and the other three factors are neutral or do not weigh heavily in favor of any one state.  Thus, under the four-factor test of *Bishop*, the substantive law that applies in this action is the law of the state in which each class member resides.  This accords with common sense, as well as common experience in class actions brought under state tort law. *E.g., Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180-83 (11th Cir. 2010) (denying certification of state law claims in a multistate class, in part because the law of each class member's home state applied to the claims); *Klay*, 382 F.3d at

1261, 1263, 1267-68 (same); *Gelfound v. Metlife Ins. Co. of Conn.*, 313 F.R.D. 674, 676-77 (S.D. Fla. 2016) (Marra, J.) (same); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *10 (S.D. Fla. Jan. 10, 2013) (same); *Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 660-61 (S.D. Fla. 2008) (same).[12]

Furthermore, applying California law to all claims of all class members, as Plaintiff seeks to do (Mot. at 25-29), would be fundamentally inconsistent with the reasonable expectations of class members.  Class members, residing in various states across the country, opened accounts with Cryptsy, a company based in Florida.  Those class members would not have had any reason to expect that the law of California would govern their claims for damages arising out of the alleged theft of currency from their Cryptsy accounts.[13]

        **b.**        **Plaintiff Makes No Attempt To Show That There Are No Material Conflicts Between the Laws of the Various States.**

Where, as here, the substantive laws of multiple states govern the claims in a class action, the plaintiff must show that the differences in state law are not substantial or can be easily reconciled.  *Klay*, 382 F.3d at 1262; *Gelfound*, 313 F.R.D. at 676.  Plaintiff, however, makes no attempt to make this showing.  Instead, he concedes that if the governing law is to be supplied by the law of each class member's home state, then no nationwide class can be certified.  Mot. at 28-29.  In the alternative, Plaintiff seeks certification of a Florida-only class.  *Id.*

---

[12] Plaintiff cites three cases for a contrary position, Mot. at 28, but two are from Illinois state courts and in the third, the choice of law analysis required by *Bishop* is contained in a single sentence.  Plaintiff also incorrectly cites the *Shutts* case as support for some type of free-floating federal rule that a nationwide class action can always be governed by the substantive law of a single state.  Mot. at 27-29.  That is a fundamental misreading of *Shutts*.  In fact, the Supreme Court held that the law of a single state could apply in a multi-state class action only if (1) application of the choice of law rules of the forum state led to the result that the substantive law of a single state should apply; *and* (2) that result was consistent with due process.  472 U.S. at 797-98.  Here, however, the first part of this test is not satisfied, and so this Court need not reach the second part to consider the due process issue.

[13] Plaintiff argues in a footnote that California law should apply to the unjust enrichment claim of all class members.  Mot. at 25 n.46.  For this claim, Florida courts apply a *lex loci contractus* rule that examines where the contract (or the implied contract underlying an unjust enrichment claim) was made.  *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1316 (S.D. Fla. 2009).  That, too, was in each class member's home state, where the class member relinquished the digital currency and transferred it to Cryptsy in Florida; it is a portion of that digital currency that (Plaintiff claims) allegedly enriched Coinbase.

**2.     Individual Issues Regarding Liability And Damages Predominate Over Common Issues, Regardless Of Whether Plaintiff Seeks To Certify A Nationwide Or Single-State Class.**

In addition, and independently, there are numerous individualized issues regarding liability and damages that preclude certification of a class (whether single-state or nationwide). As the Eleventh Circuit has explained, a class should not be certified if "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims." *Klay*, 382 F.2d at 1255; *Bussey*, 562 F. App'x at 789; *Cotromano*, 2018 WL 2047468, at *20-21 (predominance test not met where class members would have to present individualized evidence to establish both liability and damages).  That is precisely the case here.

As explained above, Plaintiff seeks $8.2 million in damages to recover the value of digital currency that was deposited into two accounts at Coinbase, and then exchanged for U.S. dollars between May 23, 2013 and October 4, 2015.  Under Plaintiff's theories of liability, Coinbase has substantial defenses to any claims for (a) losses that occurred before June 2014 (when, according to Plaintiff, Coinbase first "knew" or "should have known" of Mr. Vernon's criminal conduct); (b) losses that occurred after October 4, 2015 (when Coinbase stopped providing exchange services to Cryptsy and Mr. Vernon); (c) losses that occurred as a result of a massive hack on July 29, 2014, in which third-party criminals stole approximately $8 million worth of digital currency belonging to Cryptsy's account holders; (d) losses that occurred as a result of Mr. Vernon's alleged theft of digital currency from Cryptsy's account holders, but which was not deposited into a Coinbase account (and was instead, for example, moved to another wallet controlled by Mr. Vernon or sold through another exchange); (e) the portion of the $8.2 million worth of digital currency that was deposited into the accounts at Coinbase but was earned by Cryptsy or Mr. Vernon from trading fees or mining activity (as those funds were not, under any theory, allegedly stolen from Cryptsy's account holders).

These defenses relate not only to damages, but also to fundamental issues of liability. For example, a Cryptsy account holder who lost 100 percent of his digital currency as a result of the hack, or before Coinbase either "knew" or "should have known" of Mr. Vernon's criminal activity, did not suffer any harm as a result of the conduct described in the Complaint; that individual, therefore, has no claim against Coinbase.  The same is true for account holders who did not deposit any funds into their Cryptsy accounts until after October 4, 2015, or whose digital

17

currency was (allegedly) stolen, but not sent to Coinbase (because, for example, Vernon either kept the stolen currency in Bitcoin or used another exchange, such as Bitfinex or an exchange in China, to exchange the currency into dollars or Chinese Yuan).

Accordingly, regardless of the resolution of any purportedly common issues, the parties and the Court will still need to conduct a series of individualized examinations of each class member's specific transactions to determine both liability and damages. These individual inquiries will necessarily include (for example): (a) when account holders deposited digital currency into their Cryptsy accounts; (b) when the currency was stolen; (c) how (and by whom) it was stolen, and (d) whether the stolen currency (or the proceeds of the stolen currency) was ever transferred into a Coinbase account. A further complication (and an additional set of individual issues) arises as a result of the fact that many or most class members do not even have transaction records (or have only partial records). *See* Mot. at 16. Those class members could perhaps be called upon to testify based upon their individual recollections of their transactions, but then Coinbase would have the right to cross-examine each class member who testifies.

This time consuming fact-finding will need to be repeated for each individual class member as part of a fair and complete adjudication of whether each person has any claim at all against Coinbase (and, if so, in what amount). But courts have repeatedly held that this type of necessary, class-member-by-class-member, individualized inquiry defeats any attempt to show that common issues predominate. *E.g., Bussey*, 562 F. App'x at 790 (predominance not met; because of "shortcomings in the data," plaintiff offered no "method for quantifying" the losses of class members); *Chiquita*, 2019 WL 2314448 at *9 ("where the determination of either liability or damages requires a case-by-case inquiry for each prospective plaintiff, courts generally consider the predominance and superiority requirements of Rule 23(b)(3) unsatisfied"); *Bouton*, 322 F.R.D. at 701 (predominance test not met where "individualized inquiries" would be necessary to establish liability). Thus, the requirements of Rule 23(b)(3) are not satisfied, and for this additional reason the Court should deny Plaintiff's Motion.

### 3. Plaintiff Has Not Provided a Workable Damages Model.

A plaintiff seeking to certify a class bears the burden of showing that damages can be calculated on a class-wide basis. *Comcast Corp.*, 569 U.S. at 34. Although individual variations in damages among class members will not necessarily preclude certification of a class, a plaintiff must present a model (or some other reliable method) to calculate damages. Moreover, as the

Supreme Court has held, a plaintiff's damages model must correlate to the theory of liability and "measure only those damages attributable to" that theory.  *Id.* at 35; *see also Bussey*, 562 F. App'x at 790-91 (reversing certification because the district court did not rigorously analyze plaintiffs' damages model); *Randolph v. J.M. Smucker Co*., 303 F.R.D. 679, 698 (S.D. Fla. 2014) ("Plaintiff has failed to present sufficient evidence of a viable damages model capable of estimating damages on a class-wide basis as is required by *Comcast*.").

Plaintiff has not satisfied his burden under *Comcast*.  Plaintiff has offered no expert testimony on damages, and he does not provide any indication about how he intends to measure damages in a way that corresponds to his theory of liability against Coinbase.  For example, Plaintiff offers no method for: (a) distinguishing damages sustained as a result of the third-party hack (in July 2014) from damages sustained as a result of Mr. Vernon's alleged theft; (b) distinguishing damages sustained before Coinbase allegedly "knew" or "should have known" about Mr. Vernon's alleged criminal conduct (in June 2014) from damages sustained thereafter; (c) distinguishing damages sustained during the period that Coinbase provided exchange services to Cryptsy and Mr. Vernon (which ended on October 4, 2015) from damages sustained thereafter; or (d) distinguishing digital currency deposited into the two accounts at Coinbase that was (allegedly) stolen from class members from digital currency deposited into the same accounts that was earned by Cryptsy and Mr. Vernon from trading fees or mining activity.

In sum, Plaintiff has not made any effort to meet his burden under *Comcast* to present a viable damages model that aligns with his theory of liability.  For that reason alone, the Motion should be denied.  *Comcast*, 569 U.S. at 35; *see also, e.g*., *Kelecseny, U.S.A., Inc*., 262 F.R.D. at 674-76 (denying class certification because of, among other things, the need for individualized inquiries to determine the facts supporting each class member's damages claims).

B.      **Plaintiff Cannot Show That A Class Action Is A Superior And Manageable Mechanism for Adjudicating Class Claims.**

Finally, a plaintiff seeking to certify a class must also show that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy.'"  Fed. R. Civ. P. 23(b)(3).  In evaluating whether the plaintiff has satisfied his burden on this issue, a district court may consider, among other things: (1) the interests of the class members in "individually controlling the prosecution … of separate actions"; (2) the extent of any pending litigation concerning the subject matter of the suit; (3) the desirability of "concentrating the litigation of

the claims in the particular forum"; and (4) the "likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3) (A)-(D). An analysis of these four factors strongly shows that Plaintiff has not established the superiority of a class action here.

The first factor weighs strongly against certification, as the overwhelming majority of class members have a substantial interest in controlling their own legal actions. As noted above, in the *Project Investors* settlement more than 99 percent of the class received no money at all in exchange for releasing their claims. If that process is replicated here (as Plaintiff intends, Mot. at 16), class members have a significant interest in bringing their own individual litigation – in which they might at least have the opportunity to obtain some relief – rather than surrendering their claims again in a class action and receiving nothing in return.

The second factor is neutral. Coinbase is not aware of any other pending litigation concerning this matter.

The third factor also weighs strongly against certification. While this particular forum is not undesirable, there is a more desirable method to address the claims against Coinbase. The Receiver was initially a plaintiff in this action but dismissed his claims without prejudice: he can revive and prosecute his claims, on behalf of Cryptsy, in an arbitration (under the terms of the contract agreed to by Coinbase and Cryptsy). The Receiver would distribute any recovery he obtained to Cryptsy's creditors – that is, the same account holders on whose behalf this action was purportedly brought. This would allow a full and fair determination of the claims asserted in the Complaint without violating the implied and express requirements of Rule 23.

The fourth factor also weighs strongly against certification. A trial of this case, whether under the law of one state or many, would not be manageable. To the contrary, it would quickly descend into a deep morass of the individualized determinations identified above that are necessary for a complete and fair adjudication of liability and damages. *Bouton*, 322 F.R.D. at 702 (class action not manageable where trial "would require a substantial amount of evidence specific to each member of an unknown number of class members").

Thus, a full evaluation of the factors set forth in Rule 23(b)(3) leads to the clear conclusion that a class action is not a superior or manageable mechanism to resolve the claims described in the Complaint. For that reason, the Motion should be denied.

## CONCLUSION

For the foregoing reasons, Coinbase respectfully requests that the Court deny the Motion.

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Coinbase respectfully requests a hearing on this motion. Coinbase requests a hearing because of the significance and complexity of the legal issues involved in this motion, as well as the complexity of the relationship among the parties and of the underlying technology.  Coinbase requests thirty (30) minutes of oral argument on this motion.

Respectfully submitted,

/s/ Steven A. Ellis
STEVEN A. ELLIS (*admitted pro hac vice*)
sellis@goodwinlaw.com
GALEN A. PHILLIPS (*admitted pro hac vice*)
gphillips@goodwinlaw.com
GOODWIN PROCTER LLP
601 S Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax.: +1 213 623 1673

ANDREW KEMP-GERSTEL
Florida Bar No.  0044332
E-mail: akg@lgplaw.com
JAMES R.  LIEBLER II
Florida Bar No.  115348
E-mail: jrlii@lgplaw.com
LIEBLER, GONZALEZ & PORTUONDO
Courthouse Tower - 25th Floor
44 West Flagler Street
Miami, FL 33130
Telephone: (305) 379-0400
Fax: (305) 379-9626

*Attorneys for Coinbase, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of August, 2019, I electronically caused the

foregoing document to be filed with the Clerk of Court using CM/ECF.  I also certify that the

foregoing document is being served this day on all counsel of record in the manner specified via

transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ James R. Liebler II
JAMES R. LIEBLER II